UNITED STATES of America,

v.

Usama BIN LADEN, a/k/a "Usamah Bin–Muhammad Bin–Ladin," a/k/a "Shaykh Usamah Bin–Ladin," a/k/a "Abu Abdullah," a/k/a "Mujahid Shaykh," a/k/a "Hajj," a/k/a "al Qaqa," a/k/a "the Director," a/k/a "the Supervisor," Muhammad Atef, a/k/a "Abu Hafs," a/k/a "Abu Hafs el Masry," a/k/a "Abu Hafs el Masry el Khabir," a/k/a "Taysir," a/k/a "Sheikh Taysir Abdullah," a/k/a "Abu Fatimah," Ayman Al Zawahiri, a/k/a "Abdel Muaz," a/k/a "Dr. Ayman al Zawahiri," a/k/a "the Doctor," Mamdouh Mahmud Salim, a/k/a "Abu Hajer al Iraqi," a/k/a "Abu Hajer," Khaled Al Fawwaz, a/k/a "Khaled Abdul Rahman Hamad al Fawwaz," a/k/a "Abu Omar," a/k/a "Hamad," Ali Mohamed, a/k/a "Ali Abdelseoud Mohamed," a/k/a "Abu Omar," a/k/a "Omar," a/k/a "Haydara," a/k/a "Taymour Ali Nasser," a/k/a "Ahmed Bahaa Eldin Mohamed Adam," Wadih El Hage, a/k/a "Abdus Sabbur," a/k/a "Abd al Sabbur," a/k/a "Wadia," a/k/a "Abu Abdullah at Lubnani," a/k/a "Norman," a/k/a "Wa'da Norman," Fazul Abdullah Mohammed, a/k/a "Harun," a/k/a "Harun Fazhl," a/k/a "Fazhl Abdullah," a/k/a "Fazhl Khan," Mohamed Sadeek Odeh, a/k/a "Abu Moath," a/k/a "Noureldine," a/k/a

"Marwan," a/k/a "Hydar," a/k/a "Abdullbast Awadah," a/k/a "Abdulbasit Awadh Mbarak Assayid," Mohamed Rashed Daoud Al–'Owhali, a/k/a "Khalid Salim Saleh Bin Rashed," a/k/a "Moath," a/k/a "Abdul Jabbar Ali Abdel–Latif," Mustafa Mohamed Fadhil, a/k/a "Mustafa Ali Elbishy," a/k/a "Hussein," a/k/a "Hussein Ali," Khalfan Khamis Mohamed, a/k/a "Khalfan Khamis," Ahmed Khalfan Ghailani, a/k/a "Fupi," a/k/a "Abubakary Khalfan Ahmed Ghailani," a/k/a "Abubakar Khalfan Ahmed," Fahid Mohammed Ally Msalam, a/k/a "Fahad M. Ally," Sheikh Ahmed Salim Swedan, a/k/a "Sheikh Bahamadi," a/k/a "Ahmed Ally," Defendants.

No. S(6) 98 Crim.1023 (LBS).

United States District Court,
S.D. New York.

June 30, 1999.

Mary Jo White, New York City, Kenneth Karas, Patrick Fitzgerald, Paul But-

ler, Assistant United States Attorneys, United States Attorney for the Southern District of New York.

Paul McCalister, New York City, for defendant Salim.

James Roth, New York City, for defendant Mohamed.

Samuel Schmidt, New York City, for defendant El Hage.

Michael Young, Carl J. Herman, New York City, for defendant Odeh.

Leonard Joy, Robert Tucker, New York City, for defendant Al–'Owhali.

## OPINION

SAND, District Judge.

The sixth superseding indictment in this case charges fifteen Defendants with numerous crimes arising from, among other things, the August 1998 bombings of the United States' embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, as well with subsequent attempts to hinder the investigation into those crimes. Five of the Defendants are presently in the custody of the Bureau of Prisons: Mamdouh Mahmud Salim, Ali Mohamed ("Mohamed"), Wadih El Hage ("El Hage"), Mohamed Sadeek Odeh ("Odeh"), and Mohamed Rashed Daoud Al–Owhali.

The Government has asked that the Court file a protective order containing the following language:

5. No defendant, counsel for a defendant, employee of counsel for a defendant, defense witness, or Courtroom personnel required by the Court for its assistance, shall have access to any classified information involved in this case unless that person shall first have:

(a) received approval from either the Government or the Court for access to the particular classified information in question . . . ; and

(b) . . . agree[d] to comply with the term[s] of this Order.

6. For the purpose of establishing security clearances necessary for access to classified information that may be involved in the pre-trial preparation or trial or appeal of this case, Standard Form 86, "Questionnaire for National Security Positions," attached releases, and full fingerprints shall be completed and submitted to the CSO forthwith by all defense counsel, persons whose assistance the defense reasonably requires and by such [C]ourtroom personnel as the Court requires for its assistance. (Karas Aff.Ex. K, at 3–4.)

The Department of Justice ("DOJ") regulations governing the clearance application process contain the following provisions:

(b) Eligibility for access to classified information is limited to United States citizens for whom an appropriate investigation of their personal and professional history affirmatively indicated loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information. . . .

(c) The Department of Justice does not discriminate on the basis of race, color, religion, sex, national origin, disability, or sexual orientation in granting access to classified information. However, the Department may investigate and consider any matter that relates to the determination of whether access is clearly consistent with the interests of national security. No negative inferences concerning the standards for access may be raised solely on the basis of the sexual orientation of the employee or mental health counseling.

28 C.F.R. § 17.41 (1998).

The proposed security clearance procedure would be supervised by a Court-appointed Court Security Officer ("CSO") who (1) "would serve as an officer of this

[C]ourt in implementing and enforcing the terms of the proposed protective order" and (2) would "not be a member of the prosecution team in this case." (Karas Aff. ¶ 14; *accord* Gov't Ltr. Reply Ex. A, *Background Material for Chairman Edwards on the Security Procedures for the Protection of Classified Information in the Custody of the Federal Courts,* at 3, appended to Letter from Chief Justice Burger to Rep. Peter W. Rodino (July 10, 1981) [hereinafter *"Memo. to Edwards"*] ("The duties of the court security officer, thus, are clearly ministerial in nature; he is not an agent or representative of the prosecution and he has no independent authority to decide who gets access to classified information.").)

The Government has also indicated that the CSO would be required to maintain the confidentiality of materials relating to any clearance application and that the DOJ's recommendation with respect to any such application would be furnished only to the Court and the particular applicant. (*See* Def's Mem. at 40–41.) The regulations governing the clearance procedures provide for appeal within DOJ, *see* Exec.Order No. 12968, 60 Fed.Reg. 40,245, at Part 5 (1995), and any applicant who received an adverse recommendation could ultimately raise *ex parte* objections with the Court, which would be the final arbiter of all clearance questions. *See generally United States v. Musa,* 833 F.Supp. 752, 755–57 (E.D.Mo.1993) (providing a detailed description of procedures used in a case involving classified information, albeit one in which the Government did not request clearance of counsel).

Defendant Odeh filed a motion objecting to the proposed protective order insofar as it requires his counsel to obtain clearance before viewing classified information. De-

fendants Mohamed and El Hage subsequently joined this motion at oral argument. (*See* Tr. Oral Arg. at 15–16).[1] The Moving Defendants argue that the Court lacks the authority to require clearance of counsel and that, even if the Court were to possess such authority, exercising it would violate their Sixth Amendment rights. At oral argument on June 22, 1999, counsel for Defendant Odeh moved to intervene in the proceedings "for the limited purposes of asserting defense counsel's independent constitutional rights on this issue." (Tr. Oral Arg. at 27.) Although Defendants Mohamed and El Hage joined in Defendant Odeh's original objection to the protective order, there is no indication that their counsel joined in the motion to intervene. The Court reserved decision on both motions.

## DISCUSSION

### I. Introduction

We begin with three basic propositions. First, pursuant to Federal Rule of Criminal Procedure 16(d)(1), which governs the use of protective orders with respect to discovery in criminal cases, the Court "may at any time order that the discovery or inspection be denied, restricted, or deferred, or make such other order as is appropriate."

Second, pursuant to Section 3 of the Classified Information Procedures Act ("CIPA"), Pub.L. No. 96–456, 94 Stat. 2025 (1980), codified at 18 U.S.C. app. 3 § 3, the Court has the authority to "issue an order to protect against the disclosure of any classified information disclosed by the United States to any defendant in any criminal case in a district court of the United States."[2]

Third, pursuant to Security Procedures Chief Justice Burger promulgated under Section 9 of CIPA, *see* 18 U.S.C.A. app. 3

---

1. We refer to Defendants Odeh, Mohamed, and El Hage collectively as the "Moving Defendants."

2. Section 1 of CIPA, which is codified at 18 U.S.C. app. 3 § 1, defines classified information to include "any information or material

that has been determined by the United States Government pursuant to an Executive order, statute, or regulation, to require protection against unauthorized disclosure for reasons of national security."

§ 9 (West 1999), "[t]he government may obtain information by any lawful means concerning the trustworthiness of persons associated with the defense and may bring such information to the attention of the court for the court's consideration in framing an appropriate protective order pursuant to Section 3 of the Act." *See* Security Procedures Established Pursuant to Public Law 96–456, 94 Stat.2025, By the Chief Justice of the United States for the Protection of Classified Information, at ¶ 5 [hereinafter "Security Procedures"].

The Court is therefore empowered to take information regarding the background of Defense counsel in this case, gleaned from an investigation conducted by the United States Attorney's Office, and consider that information in framing a protective order that attempts to prevent disclosure of confidential information. (*See* Gov't Ltr. Reply Ex. B, *Background Material for Chairman Boland and Chairman Rodino on the Security Procedures for the Protection of Classified Information in the Custody of the Federal Courts*, at 2, appended to Letter from Chief Justice Burger to Rep. Peter W. Rodino (July 10, 1981) [hereinafter *"Memo. to Boland and Rodino"*] ("The purpose of . . . [S]ection [5] is to make clear that it is proper for the court to receive and consider any information in the possession of the government which relates to the trustworthiness of persons associated with the defense.").)

The Moving Defendants have argued, however, that the rules do not allow the Court to direct Defense counsel to participate in any clearance process and, in addition, that use of such a compulsory procedure would be both unconstitutional and undesirable.

We are therefore presented with three questions. (1) Do the rules governing cases involving classified information permit the Court to direct counsel to apply for security clearance? (2) Is it constitutional to require counsel to utilize a process in which DOJ makes an initial recommendation as to clearance applications but that leaves final authority to resolve all clearance matters with the Court? (3) If use of this procedure is in fact permissible, should the Court direct counsel for the Moving Defendants to submit to·it or, in the alternative, should the Court allow counsel to "opt out" and therefore force the United States Attorney's Office to conduct its own investigation into each attorney's background and to furnish that background information to the Court, pursuant to Section 5 of the Chief Justice's Security Procedures? There is a remarkable paucity of case law addressing these questions and they certainly appear to be matters of first impression within this Circuit.

## II. Three Questions

### (1) The Court's Authority to Compel Clearance

The Moving Defendants argue that the legislative history of CIPA and the circumstances surrounding Chief Justice Burger's promulgation of the Security Procedures create an inference that neither Congress nor the Chief Justice vested the Court with the authority to compel Defense counsel to undergo a DOJ-initiated security clearance procedure. We think the sounder reading of the available material indicates that although neither Congress nor the Chief Justice sought to impose a mandatory clearance requirement in all cases involving classified information, they did not attempt to foreclose resort to such a requirement in all circumstances.

CIPA and the accompanying Security Procedures create a system by which the trial court has wide latitude to impose reasonable restrictions likely to prevent the unauthorized disclosure of classified information. *See, e.g.,* S.Rep. 96–823 (1980), *reprint in* 1980 U.S.C.C.A.N. 4294 ("The details of each [protective] order are fashioned by the trial judge according to the circumstances of the particular case."); *Memo. to Boland and Rodino*, at 2 ("The trial judge, and the trial judge alone, in

other words, decides what classified information the defendant is entitled to receive from the government and what provisions are to be included in a protective order."); *id.* at 5 ("In each instance, the trial court judge is free to make whatever decision he wishes to make with regard to defense access to classified information, and the rules in no way interfere with the judge's discretion in this regard."); *Memo. to Edwards,* at 3 (stating that the Court "in the exercise of its discretion," rather than the CSO, should "determine who may have access to classified materials" and "under what conditions the materials may be reviewed"); *see also* Gov't Br. at 23–24 (quoting *Greymail Legislation: Hearings Before the Subcomm. on Legislation of the Permanent Select Comm. on Intelligence,* 96th Cong. (1979) (statement of Morton H. Halperin, American Civil Liberties Union)).

The text and structure of both CIPA and the Security Procedures therefore create a presumption that the Court possesses the authority to require Defense counsel to seek security clearance before the Court will provide them with access to classified materials. Even conceding that the history surrounding enactment of these provisions is at times murky, there is simply little to support the contention that Congress or the Chief Justice acted to *prohibit* the courts from utilizing a clearance requirement in every circumstance. *See, e.g., Memo. to Boland and Rodino,* at 2 (stating that Section 5 of CIPA does not "require defense personnel to obtain security clearances" but that "an inquiry concerning defense personnel obviously may be appropriate in some cases," that "Section 5 does not attempt to define the range of inquiry that may be necessary," and offering no indication that either CIPA or the Security procedures disallow use of a clearance requirement).

We recognize that this position may appear to be at odds with the result in *United States v. Jolliff,* 548 F.Supp. 232 (D.Md.1981), which stated that "Section 5 [of CIPA] does not provide the Court with authority to make submission to a security clearance requirement a prerequisite to representation of a defendant in a case involving classified information." *Id.* at 233. A similar sentiment is expressed in *United States v. Smith,* 706 F.Supp. 593 (M.D.Tenn.1989), in which the Court stated that it "finds no authority in ... [S]ection [5] for requiring submission to a security clearance as a prerequisite to representation of a defendant in a case involving classified information". *Id.* at 596 n. 1, *rev'd on other grounds,* 899 F.2d 564 (6th Cir.1990). The Moving Defendants rely substantially on both decisions.

The Government distinguishes these cases on the ground that their analyses are limited to Section 5 of CIPA and make no reference to Section 3. We find the Government's reading of both decisions persuasive. We also note that the relevant clause from *Jolliff* may well be *obiter dictum* as the Government apparently did not request clearance in that case.

Even if we were to read *Jolliff* and *Smith* as holding that CIPA does not permit any clearance requirement, however, we would depart from their analyses. We simply see no indication that Congress or the Chief Justice aimed to preclude resort to compulsory clearance of counsel in all circumstances. To the contrary, both CIPA and the Security Procedures consistently leave the most sensitive questions surrounding classified information to be resolved in the sound discretion of the District Courts. We therefore conclude that our authority under the Federal Rules of Criminal Procedure, CIPA, and the Chief Justice's Security Procedures encompasses a power to require counsel to seek security clearance.

### (2) The Constitutionality of Compelling Clearance

■ We must also evaluate whether it is consistent with the Federal Constitution to impose a clearance requirement on De-

fense counsel in this case. The Moving Defendants have asserted that imposition of a mandatory DOJ-initiated clearance procedure violates their rights under the Sixth Amendment. Our starting point must be the Supreme Court's conclusion that the Sixth Amendment does not promise a defendant his choice of counsel but rather aims to guarantee that each criminal defendant receives an effective advocate. *See Wheat v. United States*, 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

In essence, the Moving Defendants' argument boils down to the claim that any DOJ-initiated security clearance procedure necessarily vests the Government with veto power over the Moving Defendants' choice of counsel and that the philosophy behind such a system is fundamentally inimical to the adversarial process. (*See* Def's Mem. at 9 ("Giving the Justice Department a veto power over who may serve as its opposing counsel offends the most elementary notions of fair play and impartial justice."); *id.* at 11 ("It is difficult to understand how there can be any serious question that giving the government the power to disqualify opposing counsel would be flatly unconstitutional.").) Although we agree that it would be flatly unconstitutional to grant the Government an unfettered ability to remove any Defendant's counsel, the facts of this case are a great distance from the parade of horribles raised by the Moving Defendants.

First, the facts do not indicate that the Government unduly delayed before requesting this procedure, such as might allow for an inference that the Government's true motivation was to harass or otherwise interfere with the Moving Defendants' pretrial preparations. The Moving Defendants argue forcefully that the Government erred by failing to advise counsel prior to appointment, or immediately thereafter, of the likely need to seek clearance. (*See* Young Aff. at 1.) We do not believe that the Government's conduct gives rise to a concern that the clearance requirement is designed to interfere with any counsel's ability to meaningfully represent his client.

On November 3, 1998, at the parties' first meeting, the Government advised Defense counsel "of the realistic probability that there would be classified information in the case, and that prudence dictated that they obtain security clearances to be permitted to receive such information." (Karas Aff. ¶ 9.) Two days later, the Government submitted a letter to the Court, which was also sent to counsel for each of the Defendants, summarizing the substance of this meeting. This letter contains the following passage:

> The Government advised defense counsel that it is anticipated that during the litigation and trial of this matter the Government and defense counsel will have to deal with classified material in some manner. . . . The Government also suggested that while it is too early to have a specific conversation about how classified information may become pertinent to the litigation of this case, defense counsel may wish to apply (through the FBI) for security clearances which take some time to obtain. . . . [T]he Government will do whatever it can to assist in the expedited processing of security clearances for any defense counsel (or staff of the Court) seeking to obtain clearances. Given that past experience has shown that CIPA litigation can be time-consuming, it is respectfully suggested that any defense counsel who intend to seek a clearance do so promptly to avoid delay down the road when the issues crystallize.

(Karas Aff.Ex. F, Letter from Patrick J. Fitzgerald, Assistant United States Attorney, to Hon. Leonard B. Sand, at 4–5 (Nov. 5, 1998).)

In February 1999, the Government again notified counsel of the need for clearance prior to receiving classified materials: "[N]ow is a good time to remind defense counsel that it will expedite matters if counsel were to begin the process

now of seeking a security clearance if that particular counsel intends to press for access to classified materials." (Karas Aff. Ex. G, Letter from Patrick Fitzgerald, Assistant United States Attorney, to Hon. Leonard B. Sand, at 4 (Feb. 17, 1999).)

We believe that the Government's notifications to counsel were sufficiently prompt to eliminate any inference of purposeful delay. The Moving Defendants assert that their counsel had already invested significant time in the case by the November 3 meeting, (*see* Young Aff. at 1), but the litigation was plainly in its infancy at that time and we see no reason to believe that the Government's request was aimed to disrupt established relationships between counsel and their clients.

Moreover, the first superseding indictment was filed on October 7 and the Moving Defendants were arraigned the following day. This marked the first expansion of a litigation that had begun in September solely with Defendant El–Hage. At the October 8 arraignment, the Court set the case down for an initial conference on November 10. Given the extremely fluid nature of the litigation in early October, as evidenced most plainly by the changing list of Defendants, as well as the incredibly voluminous materials in the Government's possession, tens of thousands of pages of which required translation from Arabic, it is not surprising that the Government had yet to determine the precise scope of its likely discovery obligations and whether the prosecution would need to produce a significant number of classified documents.

In sum, the magnitude of the Government's investigation, the limited work Defense counsel had yet performed on behalf of their clients, and the fact that the Government advised Defense counsel about the need for clearance at the parties' first face-to-face meeting in early November, all serve to eliminate any inference that the Government purposefully delayed in requesting clearances to force a change of counsel mid-stream or for the purpose of harassment. We are simply not faced with a situation in which an eleventh hour request appears designed to disrupt counsels' preparations or to drive them from this litigation.

Second, we think the Moving Defendants overstate the danger that one of their attorneys might be arbitrarily dismissed at the behest of the prosecution. The CSO will be an officer of the Court, rather than a member of the prosecution, and will be prohibited from sharing *any* information regarding clearance applications, including their outcomes, with members of the prosecution.[3] The Government has also indicated that it can have outside contractors conduct the requisite background investigations, rather than FBI agents. (*See* Gov't Ltr. Reply. at 2 n. 1.)

Further, in the unlikely event that DOJ officials recommend that the Court deny any counsel's application for clearance, this result would be appealable both within the DOJ as well as directly to the Court. The Court will of course remain the ultimate arbiter of disputes surrounding the security clearance applications and will be available to insure both proper respect for counsels' confidentiality and that no applications are denied for improper reasons. *See, e.g., United States v. Musa,* 833 F.Supp. 752, 756–57 (E.D.Mo.1993) (stating that if "the CSO should determine that any person should not obtain a security clearance," the Court will "conduct an *ex parte* hearing to determine" that person's eligibility to see classified materials, that "[o]nly the CSO and defense counsel will be heard on this issue," and that "the prosecution will not be notified of the hear-

---

**3.** The Government did not indicate whether it would be appropriate to appoint multiple CSOs to the case: one whose sole obligation would be to process Defense counsels' security clearance applications and another who could handle all other aspects of the case, further insuring a true "fire wall" between the investigative and prosecutorial arms of the Department of Justice. We will await some input from the Government on this and related questions before entering any protective order. *See infra* at 124.

ing or allowed to participate in it"). Although we recognize the Moving Defendants' concern that the Government not be given the unfettered power to disqualify their present counsel, we think the procedures governing the clearance process, when combined with the Court's vigilance in responding to questions of potential abuse in the application process, will be sufficient to protect the Moving Defendants' rights.

### (3) The Desirability of Compelling Clearance

■ The exceptional facts of this case decidedly warrant some inquiry into counsels' backgrounds to minimize the risk of the unauthorized disclosure of classified information. Counsel for the Moving Defendants conceded as much at oral argument. (*See* Tr. Oral Arg. At 32–36, 42.) We note that the exceptional facts alleged in the indictment also require clearance of Court personnel and members of the Government who will come into contact with classified information. The circumstances precipitating CIPA's enactment make it abundantly clear that it is easier and more effective to prevent the release of classified information in advance than to attempt to undo the damage of unauthorized disclosures after the fact. *See Snepp v. United States,* 444 U.S. 507, 512–13 & nn. 7–8, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (*per curiam*) (noting that unless the Government has adequate mechanisms to prevent unauthorized disclosures, potential sources of classified information may be unwilling to provide such information to the intelligence-gathering community); *id.* at 514–15, 100 S.Ct. 763 (stating that unauthorized disclosures might cause irreparable harm to the Government and that it may be practically impossible to seek redress against the disclosing party); S.Rep. 96–823 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4294 (referring to a study performed by the Subcommittee on Secrecy and Disclosure of the Senate Intelligence Committee and stating that the study's "key finding . . . was that prosecu-

tion of a defendant for disclosing national security information often requires the disclosure in the course of trial of the very information the laws seek to protect"); *see also* Exec.Order No. 12968, 60 Fed.Reg. 40,245, at preamble (1995).

The concerns are heightened in this case because the Government's investigation is ongoing, which increases the possibility that unauthorized disclosures might place additional lives in danger. In addition, the Government has alleged that the Defendants are part of a conspiracy whose members have previously gained access to unfiled court documents and forwarded those documents to other members of the conspiracy. (*See* Def's Mem. at 6 & n. 3.) The case therefore involves special circumstances warranting particular control over the flow of classified information, such as have already prompted the Court to impose restrictive conditions of confinement on the Defendants and which formed the basis of the protective order that the Court entered in December 1998.

Our insistence that every person who comes into contact with classified information in this litigation undergo some objective evaluation is, of course, no commentary on the reputations of the Defense counsel in this case. The fact remains that it is practically impossible to remedy the damage of an unauthorized disclosure *ex post* and we refuse to await the possibility of repairing what in this case might be a particularly disastrous security breach when reasonable measures could have prevented the disclosure altogether. We believe it is appropriate to require some form of clearance on the facts we have before us.

Having concluded that a clearance requirement is warranted, we must decide whether to utilize the DOJ-initiated clearance procedure or the alternative course discussed previously, by which the United States Attorney's Office would investigate counsel for the Moving Defendants and

advise the Court of the results.[4] The issue therefore is not "whether?" but "by whom?" the inquiry will be conducted. The Government suggests that it be done initially by the CSO, without involvement by the prosecution. Counsel for one of the Moving Defendants has suggested that it be conducted by the United States Attorney's Office without counsels' cooperation and with a report to be made in the first instance to the Court.

Aside from the Moving Defendants' philosophical objection to the DOJ-initiated procedure on the ground that it requires their counsel to participate actively in certain phases of the review, we see not a single advantage to any investigation conducted by the United States Attorney's Office. Such an inquiry would certainly be more time-consuming and expensive than the DOJ-initiated procedure and would, in all likelihood, prove more intrusive and fundamentally inconsistent with the adversarial process.

Moreover, given that it presently takes DOJ more than two months to process clearance applications, we can only surmise how long it would take the United States Attorney's Office, which does not have the same expertise in that particular area, to conduct an equally probing investigation without the underlying individual's consent. It is inescapable that such a system would require a far lengthier investigation, during which time counsel for the Moving Defendants would of course be precluded from viewing classified information.

In addition, this approach would force the Court to make clearance determinations in the first instance without the reasoned judgment of the Department of Justice, the agency with the greatest expertise in this area. We find it entirely preferable to allow experts in clearance matters—who will be bound by strict rules of confidentiality—to consider each counsel's application initially rather than to resort to a system whereby the Court and the United States Attorney's Office are forced to act as amateur sleuths. In the likely event that counsels' clearance applications are unremarkable, the DOJ-initiated procedure offers the very real possibility that the fewest possible individuals will learn anything whatsoever about counsels' backgrounds.

These drawbacks all pale in comparison, however, to what might happen if the United States Attorney's Office proved unable to glean sufficient information from its own investigation to satisfy the Court that counsel could properly be cleared. We would then find ourselves several more months down the road with the need for additional counsel who would themselves need to undergo a lengthy clearance procedure of some type. Regardless of whether the Government or the Moving Defendants should shoulder a larger portion of blame for the fact that the clearance question has not been litigated until this late date, (*compare* Karas Aff. at ¶ 9, *with* Young Aff. at 1–4), the fact remains that we are here. The Court will not risk delaying the trial of this matter, especially in light of the restrictive conditions of the Defendants' confinement, to utilize an entirely undesirable method of clearing Defense counsel.

Given the nature of the potential classified information and the special circumstances surrounding this case, we conclude

---

4. The parties dispute the significance of the court's actions in another classified information case in the Eastern District of New York, *United States v. Pappas*, which are apparently unreported save for a Second Circuit decision that does not address the issues that presently concern us. *See* 94 F.3d 795 (2d Cir.1996). In *Pappas*, all defense counsel apparently sought clearance but the CSO expressed concern about one application. The Court thereafter entered a modified protective order granting that counsel access to at least some of the materials, albeit on a restricted basis. (*See* Karas Aff. at 9–10 n. 7; Def's Mem. at 17.) In the event that similar circumstances arise here, the Court will consider entering an amended protective order. Until that time, however, Defense counsel who wish to have access to classified information must seek clearance.

that counsel must submit to the DOJ-initiated security clearance procedure should they wish to have access to classified information. Accordingly, the Moving Defendants' motion is denied.

### III. The Motion to Intervene

██ The request to intervene by counsel for Defendant Odeh is sparsely briefed on both sides. Defendant Odeh's original brief only alluded to counsel's personal rights and counsel made no formal request to intervene until oral argument, after all briefs had been filed. Our research has not revealed any reported case, either from within this Circuit or elsewhere, in which a court entertained a request similar to that proffered by counsel to Defendant Odeh. If there is a "typical" motion for intervention in a criminal proceeding, it would be a First Amendment request, by the news media, for access to trial records or court proceedings. *See, e.g., Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 598–99, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *United States v. Antar*, 38 F.3d 1348, 1352 (3d Cir.1994).

Here, by contrast, counsel has asserted his own privacy rights. The Supreme Court has referred to two analytically distinct privacy interests: "[o]ne is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) (footnote omitted). The former right, which the Second Circuit has characterized "as a right to 'confidentiality,' " *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir.1994), is implicated here because counsel objects to being required to disclose private information. We therefore do not quarrel with counsel's assertion that, if permitted to intervene, he could assert some valid interest in not being forced to reveal certain personal information.

The presence of a valid interest, however, does not terminate our inquiry. *See,*

*e.g., Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 458, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). The Second Circuit has explained that claims for violation of a privacy right, such as that asserted by counsel, should be examined using intermediate scrutiny. *See Barry v. City of New York*, 712 F.2d 1554, 1559 (2d Cir. 1983); *see also Eisenbud v. Suffolk County*, 841 F.2d 42, 45–46 (2d Cir.1988). Under this level of review, the Court balances the competing interests of counsel and the Government and must uphold the policy if it is "substantially related to an important governmental objective," *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988), or, in Second Circuit parlance, if the policy "is designed to further a substantial governmental interest and does not land very wide of any reasonable mark in making its classifications," *Eisenbud*, 841 F.2d at 46.

Here, there is plainly a substantial governmental objective in guarding against the unauthorized disclosure of classified information, this interest manifestly outweighs counsel's desire not to disclose personal information needed to conduct a thorough background check, and the clearance procedure presents a reasonable method for effecting the Government's legitimate goals. *Cf. Barry*, 712 F.2d at 1560 (stating that mandatory financial disclosure requirement imposed on certain New York City officials, employees, and candidates for office "furthers a substantial, *possibly even a compelling,* state interest" (emphasis added)). Moreover, and as discussed previously, the procedure contains numerous attendant security features that minimize the possibility of any subsequent disclosures by Government officials. *See Nixon*, 433 U.S. at 458, 97 S.Ct. 2777; *Whalen*, 429 U.S. at 600–02, 605–06, 97 S.Ct. 869; *Eisenbud*, 841 F.2d at 47; *Barry*, 712 F.2d at 1561.

Counsel has simply provided no authority, and we are aware of none, that would sustain his objections with respect to the clearance procedure. Any faithful balanc-

**124**

ing of the relevant interests must end with the conclusion that counsel's own privacy rights are outweighed by the Government's right to protect highly classified information, the unauthorized disclosure of which could cause irreparable harm to our national security. Accordingly, counsel's motion to intervene is denied.

### CONCLUSION

On the facts of this case, there can be no serious question about the need for some inquiry into counsels' backgrounds and we have no difficulty choosing between the competing methods proposed by the parties. We find unacceptable the contention of counsel for Odeh that it would be preferable for the Court to direct that an investigation of counsel be conducted but that he not be required to cooperate or give answers to specific background questions. The goal should not be to establish how time-consuming and expensive an investigation, conducted without the subjects' cooperation, might prove to be. The DOJ-initiated procedure offers a far more efficient mechanism for resolving clearance questions and it evinces a greater respect for the rights asserted in the Moving Defendants' briefs.

We have considered all of the Moving Defendants' contentions, as well as those offered by counsel for Defendant Odeh, and find them to be without merit. Accordingly, both Motions are denied.

The Court directs that the parties confer regarding possible alterations to the protective order that might more clearly spell out the highly confidential nature of counsels' clearance applications and the methods that will be undertaken to insure that no information regarding these applications is disclosed to anyone in the prosecution team. *See, e.g., United States v. Musa,* 833 F.Supp. 752, 756 (E.D.Mo. 1993). The Court further directs the Government to inquire about the feasibility of modifying Standard Form 86 in any ways that might minimize needless intrusion into Defense counsels' backgrounds. Although the Department of Justice may believe that every aspect of its review procedure is essential, counsel are not seeking Government employment and it is conceivable that certain portions of the clearance procedure can be modified.

Finally, the parties should confer and contact the Court with a proposed date for a conference during the week of July 12, at which time the Court can consider any outstanding issues with respect to the protective order.

SO ORDERED.