**UNITED STATES of America**

v.

**Syed HASHMI, a/k/a "Fahad,"
Defendant.**

**No. 06 Cr. 442 (LAP).**

United States District Court,
S.D. New York.

Jan. 16, 2008.

78

Edward Casey O'Callaghan, Iris Lan, Lisa Anna Baroni, Brendan Robert McGuire, U.S. Attorney's Office, Southern District New York, New York, NY, for Plaintiff.

Khurrum Basir Wahid, Sean Michael Maher, Wahid Vizcaino & Maher, LLP, New York, NY, for Defendant.

## MEMORANDUM AND ORDER

LORETTA A. PRESKA, District Judge.

Before the Court are motions by Defendant Syed Hashmi challenging the constitutionality of (i) the Classified Information Procedures Act, 18 U.S.C.App. 3, § 1, et seq. ("CIPA"), (ii) requiring his attorneys to obtain a security clearance prior to engaging in discovery, and (iii) the special administrative measures ("SAMs") imposed by the Acting Attorney General pursuant to 28 C.F.R. § 501.3, which place certain limitations on communications between the Defendant and his attorneys.[1] Defendant's motions are denied for the reasons set forth below.

[1.] See generally Defendant Syed Hashmi's Motion For An Order Declaring CIPA Unconstitutional On Its Face or As Applied, or in the Alternative Rejecting Its Application to Defendant Syed Hashmi ("Def. CIPA Mem."), filed on October 6, 2007; Defendant Syed Hashmi's Emergency Motion for Hearing to Pro-

## I. Background

### A. The Indictment and Arrest

On May 24, 2006, Syed Hashmi was charged, in a four count indictment, with conspiracy to provide material support to al Qaeda (Count One); substantive material support to al Qaeda (Count Two); conspiracy to make or receive a contribution of funds, goods or services to, and for the benefit of al Qaeda, in violation of the International Emergency Economic Powers Act (Count Three); and a corresponding substantive charge (Count Four). See 18 U.S.C. § 2339B; 50 U.S.C. § 1705(b).

On June 6, 2006, the Defendant was arrested at Heathrow Airport, outside of London, on a provisional arrest warrant issued on the Indictment which was executed by United Kingdom authorities at the United States's request. On or about May 3, 2007, the Defendant was ordered extradited to the United States. He was turned over to the custody of the United States on May 25, 2007, and arraigned on May 29, 2007.

### B. The Status of Discovery

There has been a limited amount of discovery in the case so far. The Government produced non-classified discovery to the Defendant in June 2007, along with a supplemental production in October 2007. These productions included documentary evidence, such as telephone records, as well as surveillance photographs and videos, items seized from the Defendant at the time of his arrest, and statements made by the Defendant at his arrest. (Gov't CIPA Mem. at 4–5.)[2]

hibit the Attorney General From Restricting Defense Counsel's Access to Defendant and Infringing on Defendant's Constitutional Rights, filed on November 13, 2007 ("Def. SAM Mem.").

[2.] "Gov't CIPA Mem." refers to Government's Memorandum of Law in Opposition to Hash-

The Government proffers that there will be classified information that is discoverable. (*Id.* at 5.) However, before discovery can proceed, the Government asks that defense counsel first obtain a "Top Secret" security clearance in order to provide for the handling of the classified material. Toward this end, the Government has proposed a protective order that would govern this process. In response to the request, Defendant submitted the instant motion.

### C. *The Special Administrative Measures*

The Defendant has been held at the Metropolitan Correctional Center in New York since May 25, 2007. His conditions of confinement are governed by restrictions put in place by the Attorney General in June 2003 pursuant to 28 C.F.R. § 501.3 (providing procedures for the issuance of special administrative measures "SAMs" reasonably necessary to protect persons against the risks of acts of violence or terrorism).

On October 29, 2007, Acting Attorney General Peter D. Keisler found that there was a substantial risk that defendant-Hashmi's communications could result in death or serious bodily injury to others and requested that the Bureau of Prisons ("BOP") implement SAM restrictions pursuant to 28 C.F.R. § 501.3. Acting Attorney General Keisler's findings were based on (1) the Defendant's former membership in an Islamic fundamentalist organization whose members promote the overthrow of Western Society; (2) the Defendant's willingness to allow co-conspirators to store gear in his apartment that he knew was destined for al Qaeda's insurgency forces in Afghanistan; (3) the Defendant's willingness to allow a co-conspirator to use his cellular phone to contact other al Qaeda supporters, including Omar Khyam who was recently convicted of conspiring to bomb targets in the United Kingdom; and (4) the Defendant's post-arrest statements indicating an intention to kill U.S. soldiers. (Gov't SAM Mem. at 3.)[3]

On November 6, 2007, Defendant's attorneys were notified that the SAMs had been implemented by the BOP. They were also advised that they were required to agree to abide by, though not endorse, the provisions laid out in the Keisler Memorandum calling for the SAMs. In particular, the Defendant objects to the following aspects of the provisions: (1) giving the BOP discretion to make attorney visits "contact" or "non-contact"; (2) preventing the Defendant from speaking to a defense investigator without his attorney present; (3) preventing the Defendant from speaking to his attorney's staff on the telephone, if the attorney is not a participant in the conversation; (4) requiring a precleared translator to translate any documents that defense counsel wants to provide the Defendant; (5) preventing the Defendant from communicating with the news media; and (6) recording conversations between the Defendant's cell and that of other inmates. (Def. SAM Mem. at 9–11.)[4]

On November 5, 2007, Mr. Khurrum Wahid, the Defendant's attorney, was notified that Mr. Hashmi was subject to these

---

mi's Motion to Declare CIPA Unconstitutional or Alternatively, Reject Its Application in This Case, filed on October 19, 2007.

**3.** "Gov't SAM Mem." refers to the Government's letter opposing defendant Syed Hashmi's pretrial motion to declare the Special Administrative Measures unconstitutional, filed on November 16, 2007.

**4.** "Def. SAM Mem." refers to the Emergency Motion for Hearing to Prohibit the Attorney General From Restricting Defense Counsel's Access to Defendant and Infringing on Defendant's Constitutional Rights, filed on November 13, 2007.

Special Administrative Measures. As a precondition to meeting with his client, Mr. Wahid was asked to sign the seventeen page memorandum enumerating the SAMs and to execute an acknowledgment and affirmation of receipt of the SAMs. After refusing to do so, Defendant, through Mr. Wahid, brought the instant motion. As it stands, Mr. Wahid is currently barred from meeting or speaking with Mr. Hashmi until he executes the SAM acknowledgment affirmation. (Wahid Aff. ¶¶ 5–6.)[5] The Court, however, with the Government's consent, has allowed Mr. Wahid to meet with his client for short periods of time before oral argument on these questions.

## II. *Discussion*

### A. *The Constitutionality of CIPA*

Defendant argues that CIPA is unconstitutional both on its face and as applied to him because its notice and hearing provisions impose "unconstitutional burdens" on the defense. (Def. CIPA Mem. at 2.) He objects to two sections of CIPA in particular. Section 5 of CIPA requires the Defendant to provide notice to the United States and the Court if he "reasonably expects to disclose or cause the disclosure of classified information." Section 6 provides a mechanism for holding a hearing, possibly in camera, for making determinations concerning the use, relevance or admissibility of classified information that would otherwise be made during the trial or pretrial proceeding. Defendant argues that these provisions, taken together (1) unfairly require him to preview his case to the Government;(2) force him to make a premature decision about whether to take the stand, infringing on his right to "testify in his own defense without penalty;" and

(3) deny him his Sixth Amendment right to confront the witnesses against him. (Def. CIPA Mem. at 2–12.)

### 1. *Background of CIPA*

None of these arguments has merit. CIPA was a legislative response to the problem of "graymail," whereby a defendant "threatens to reveal classified information during the course of his trial in the hope of forcing the government to drop the criminal charge against him." *United States v. Anderson*, 872 F.2d 1508, 1514 (11th Cir.1989); *United States v. Pappas*, 94 F.3d 795, 799 (2d Cir.1996). CIPA was designed "to reconcile, on the one hand, a criminal defendant's right to obtain prior to trial classified information and introduce such material at trial, with, on the other hand, the government's duty to protect from disclosure sensitive information that could compromise national security." *United States v. Libby*, 453 F.Supp.2d 35, 37 (D.D.C.2006). The statute is a procedural tool allowing a court to make rulings on admissibility and relevance before the commencement of trial. *Id.*

The constitutionality of the statute has been tested repeatedly and uniformly upheld. The Court of Appeals has sustained the constitutionality of the pretrial notification requirements. *United States v. Wilson*, 750 F.2d 7, 9 (2d Cir.1984) ("We see no constitutional infirmity in the pretrial notification requirements of Section 5."). Scores of courts have concluded the same. *See, e.g., United States v. Bin Laden*, S(7) 98 Cr. 1023(LBS), 2001 WL 66393, at *4 (S.D.N.Y. Jan. 25, 2001); *United States v. Yunis*, 924 F.2d 1086, 1094–95 (D.C.Cir.1991). Defendant does not attempt to distinguish *Wilson*, which would

---

**5.** "Wahid Aff." refers to the Affirmation of Khurrum B. Wahid, filed on November 14, 2007.

seemingly end this Court's inquiry. But a few words are in order to address Defendant's more specific arguments.

### 2. CIPA Does Not Violate "The Separation of Powers"

■ Defendant argues that the notice and hearing requirements of Sections 5 and 6 "impose unconstitutional burdens on the defense" in violation of "the separation of powers." (Def. CIPA Mem. at 2). The argument is not fleshed out, but construing it as a Due Process challenge, the Court rejects it. The burdens CIPA imposes on the Defendant are also imposed on the Government. *See, e.g., United States v. Ivy,* No.Crim. A. No. 91–00602–04, 1993 WL 316215, at *5 (E.D.Pa. August 12, 1993) ("CIPA burdens are not one-sided, but rather are carefully balanced"); *United States v. Poindexter,* 725 F.Supp. 13, 32 (D.D.C.1989) (CIPA burdens not one-sided).

### 3. CIPA Does Not Violate Defendant's Fifth Amendment Privilege Against Self-incrimination

■ CIPA Section 5's pretrial notification requirement likewise does not infringe on a defendant's privilege against self-incrimination. (*See* Def. CIPA Mem. at 6–12.) Section 5(a) requires the defendant to notify the Government and the Court only if he "reasonably expects to disclose or cause the disclosure of classified information" so that the Court can rule on the admissibility of the potential evidence before the trial starts. In the event that the defendant does not comply, the Court *may,* under CIPA § 5(b), preclude the disclosure of the classified information.

The potential of precluding the disclosure does not amount to a "penalty" for the defendant's exercising of his right to remain silent, as Defendant argues. (Def. CIPA Mem. at 8) (citing *Brooks v. Tennes-*

*see,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972)). The Fifth Amendment guarantees that no person "shall be *compelled* in any criminal case to be a witness against himself." (emphasis added). The existence of compulsion is a prerequisite to the application of the self-incrimination privilege. *See* LaFave, Israel, & King, 1 Criminal Procedure § 2.10(b) (2d ed. 1999). The Supreme Court, in *Brooks,* found unconstitutional a Tennessee law requiring the defendant to be his own witness if he was to take the stand at all because it amounted to a "heavy burden" on the defendant's right not to testify. *Brooks,* 406 U.S. at 610, 92 S.Ct. 1891. But the Court held that the State's interests in the rule—preventing the witness from being influenced by other testimony—were "insufficient to override the defendant's right to remain silent at trial." *Id.* at 611, 92 S.Ct. 1891.

This Court's inquiry, then, is to ask whether the Government can advance a legitimate regulatory interest in attaching adverse consequence to the defendant's failure to disclose certain information. *See* LaFave, Israel, & King, 1 Criminal Procedure § 2.10(b) (2d ed. 1999). The Court has no trouble concluding the CIPA strikes the proper balance. Unlike in *Brooks,* the "penalty" the Defendant faces is the *possible* preclusion of undisclosed classified information—possible because preclusion is not mandatory under CIPA § 5(b). This potentiality, when compared to the Government's interest in protecting classified information, is a legitimate regulatory interest like others the law recognizes. *See also* Fed.R.Crim.P. 12.1 (alibi defense); Fed.R.Crim.P. 12.2 (insanity defense); Fed.R.Crim.P. 12.3 (public authority defense); and Fed.R.Crim.P. 16 (medical and scientific tests, tangible objects, and certain documents). In so holding, the Court joins its sister courts in uphold-

ing CIPA §§ 5 and 6. *See United States v. Wen Ho Lee,* 90 F.Supp.2d. 1324, 1326–27 (D.N.M.2000); *United States v. Poindexter,* 725 F.Supp. 13, 34 (D.D.C.1989) ("The leap from the [CIPA] requirement of disclosure—similar to the disclosure of an alibi or insanity defense—to a violation of a defendant's right to testify or not to testify is too wide to be justified.").

Accordingly, Defendant's facial challenge to the validity of CIPA is denied.[6]

## B. *The Security Clearance Requirement*

Defendant argues that simply fashioning a protective order should assuage any concerns the Government may have about disseminating classified information and that requiring a background check, which is a precondition to a Top Secret clearance, impermissibly interferes with the Defendant's right to counsel of his choice.

### 1. *The Court's Authority to Order a Security Clearance*

■ As an initial matter, the Court finds that it has the authority under CIPA to order defense counsel to obtain a security clearance before proceeding with discovery. Other Courts have found no authority in Section 5 of CIPA, which as discussed above, instructs the Defendant to notify the United States if it expects to disclose classified information. *See United States v. Smith,* 706 F.Supp. 593, 596 n. 1 (M.D.Tenn.1989); *United States v. Jolliff,* 548 F.Supp. 232, 233 (D.Md.1981). However, this Court, like Judge Sand, finds that Section 3 of CIPA confers sufficient authority. *See United States v. Usama Bin Laden,* 58 F.Supp.2d 113 (S.D.N.Y.1999). Section 3 of CIPA provides that the Court has the authority to

"issue an order to protect against the disclosure of any classified information disclosed by the United States to any defendant in any criminal case in a district court of the United States." Section 9 of CIPA instructs the Chief Justice of the Supreme Court to "prescribe rules establishing procedures for the protection against unauthorized disclosure of any classified information in the custody of the United States district courts, courts of appeal, or Supreme Court." Pursuant to this authority, on February 12, 1981, Chief Justice Burger promulgated Security Procedures providing that "[t]he government may obtain information *by any lawful means* concerning the trustworthiness of persons associated with the defense and may bring such information to the attention of the court for the court's consideration in framing an appropriate protective order pursuant to Section 3 of the Act." *See* 18 U.S.C.A. app. 3 § 9 (West 2007); Security Procedures Established Pursuant to Public Law 96–456, 94 Stat. 2025, By the Chief Justice of the United States for the Protection of Classified Information ¶ 5 (emphasis added). Given this broad grant of authority, CIPA permits requiring defense counsel to undergo a background check for the purpose of obtaining a security clearance in an appropriate case.

### 2. *The Constitutionality of Requiring a Security Clearance*

■■ Before taking up the question of whether to instruct counsel to obtain the clearance, the Court must consider whether doing so would violate the Defendant's right to choice of counsel. The Sixth Amendment provides that "the accused

---

**6.** Defendant also argues that CIPA denies him his right to confront witnesses against him. But this argument is based on speculation about the adequacy of certain substitutions of classified information authorized by CIPA. Discovery in this case has yet to begin, and thus it would be premature to take up this argument.

shall enjoy the right to ... have the assistance of counsel for his defense." The right was designed to assure fairness in the adversary criminal process, since presumably laymen would have little skill in arguing the law or in coping with an intricate procedural system. *Wheat v. United States,* 486 U.S. 153, 158, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). Its essential aim is to guarantee an effective advocate for each criminal defendant, not to ensure that a defendant will "inexorably be represented by the lawyer whom he prefers." *Id.* at 158, 108 S.Ct. 1692. While the Amendment's protections include the right to counsel of one's choice, this right can be "circumscribed in several important respects." *Id.* at 159, 108 S.Ct. 1692. Permissible restrictions on the defendant's right to counsel generally flow from a countervailing governmental interest relating to judicial administration. *See* La-Fave, Israel, & King, 3 Criminal Procedure, § 11.4 (2d Ed. 1984 & Supp. 2007); *United States v. Nichols,* 841 F.2d 1485, 1502 (10th Cir.1988) (holding that a court may restrict a defendant's choice when allowing the defendant to be represented by a particular attorney would adversely affect an important public interest). For example, a defendant has no right to be represented by someone who is not a member of the bar or who has conflicts with other clients. *See Wheat,* 486 U.S. at 159–160, 108 S.Ct. 1692.

The Court finds that appropriate countervailing governmental interests exist here to justify ordering counsel to obtain a security clearance. The Government has a strong interest in preventing the irreparable harm of disclosing classified information, which might jeopardize national security. *See Snepp v. United States,* 444 U.S. 507, 514–515, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980). As Judge Sand observed, it is "practically impossible to remedy the damage of an unauthorized disclosure *ex post.*"

*Bin Laden,* 58 F.Supp.2d at 121. Furthermore, it is "obvious and unarguable" that no governmental interest is more compelling than the security of the Nation. *Aptheker v. Secretary of State,* 378 U.S. 500, 509, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964). While requiring security clearances may, to some extent, impose on the Defendant's right to his counsel of choice, that interest is outweighed by countervailing governmental interests here. *See also, United States v. Al–Arian,* 267 F.Supp.2d 1258 (M.D.Fla.2003) (requiring defense counsel to submit to a security clearance).

Defendant's reliance on *United States v. Gonzalez–Lopez,* 548 U.S. 140, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) for the proposition that he should be able to retain non-cleared counsel is misplaced. That case involved a defendant whose counsel of choice, a California attorney, was denied *pro hac vice* admission to a Missouri District Court based in part on an erroneous reading of the Missouri Rules of Professional Conduct. *Id.* at 2560–61. Before the Supreme Court, the Government did not dispute that the District Court erroneously deprived Respondent of counsel of his choice; instead it argued that there was no Sixth Amendment violation without a showing of prejudice. *See id.* at 2561. The Court rejected this argument, finding that a Defendant's right to counsel of choice was violated at the moment of the erroneous deprivation, without a further showing of prejudice. *Id.* at 2565 ("A choice-of-counsel violation occurs *whenever* the defendant's choice is wrongfully denied.").

A careful reading of *Gonzalez–Lopez* demonstrates that it is a case more about harmless error review than about defining the content to the right to counsel of choice. The Government's concession that the Defendant was *erroneously* denied his counsel of choice was crucial to the Court's

decision. In light of this concession, the Court did not elucidate the circumstances under which a deprivation would, in fact, be erroneous because that issue was not before the Court. Unsurprisingly, then, the Court emphasized that "[n]othing we have said today casts any doubt or places any qualification upon our previous holdings that limit the right to counsel of choice." *Id.* at 2565. It also reaffirmed its previous holding that the right to counsel of choice may be "circumscribed" in several important respects. *Id.* at 2561.

This Court's conclusion that requiring a security clearance does not infringe on the Defendant's right to counsel of choice, therefore, remains undisturbed by *Gonzalez–Lopez.* The Court finds that the Government's interest in preventing the unauthorized dissemination of classified information circumscribes Defendant's right to assistance of counsel in this case.

### C. *The Special Administrative Measures*

As it stands, the Defendant is subject to SAMs pursuant to 28 C.F.R. § 501.3, while he awaits trial. Defendant, in substance, make three arguments: (1) that the Government has imposed SAMs that are not "prisoner specific," that is, that do not take into account the Defendant's particular circumstances; (2) that the SAMs deny the Defendant a meaningful opportunity to participate in his own defense; and (3) that requiring his attorneys to sign an affirmation of receipt of the SAMs violates his right to counsel of choice. The Government responds by arguing that the Court does not have jurisdiction over the question, since the prisoner has not exhausted his administrative remedies. In the alternative, it argues that his rights have not been violated.

### 1. *Exhaustion*

■■ Whether the Court has jurisdiction over the Defendant's claims is a threshold question. Federal courts, courts of limited jurisdiction, must satisfy themselves of the presence of subject matter jurisdiction before proceeding to the merits of a case. *See, e.g., Wynn v. AC Rochester,* 273 F.3d 153, 157 (2d Cir.2001). Because the BOP has an administrative remedy in place, *See* 28 C.F.R. §§ 501.2(d), 501.3(e), the Government argues that the Defendant must first exhaust these remedies because of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), which provides that "no *action* shall be brought with respect to prison conditions under ... Federal law, by a prisoner ... until such administrative remedies as are available are exhausted." (emphasis added).

As the Court's emphasis indicates, whether the defendant in this case must exhaust his BOP remedies turns on whether the instant *motion* constitutes an "action" within the meaning of the PLRA. The statute does not define the term. The Court, in what appears to be a matter of first impression in this Circuit, concludes that the instant motion is not an "action" and that the Court can proceed to the defendant's constitutional challenge.

The PLRA was passed in the wake of a "sharp rise in prisoner litigation in federal courts." *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006). The Supreme Court has recognized that Congress's purpose in enacting this exhaustion requirement was to "reduce the quantity and improve the quality of prisoner suits." *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The exhaustion requirement served this ultimate goal of reducing suits insofar as it afforded corrections officials the opportunity to address complaints in-

ternally, which might (1) potentially filter out some frivolous claims and (2) provide a record for the reviewing Court, in the event of a lawsuit. *Id.*

In light of the purposes of the PLRA, an "action" is best understood as "a civil or criminal judicial proceeding." *Black's Law Dictionary* 28 (7th ed. 1999); *accord United States v. Ayala Lopez,* 327 F.Supp.2d 138, 141 n. 1 (D.P.R.2004).[7] The Court finds that this definition constitutes the plain meaning of the statutory language, a meaning that should be given effect unless it would create an absurd result. *See, e.g., Salinas v. United States,* 522 U.S. 52, 57, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). Finding that the current motion is not an "action" would not lead to an absurd result. Congress's clear purpose in enacting the PLRA, as the Supreme Court has recognized, was to reduce the quantity of lawsuits related to prison conditions. The initiation of a new lawsuit is certainly a more costly process than an application for a specific ruling or order brought to a court in the context of an already-pending action. A new lawsuit requires, *inter alia,* the assignment of a Judge; the effectuation of service on the Government; a formal answer from the Defendant; the briefing of a motion to dismiss or for summary judgment, etc. This is a costly process. A motion by a pretrial detainee, on the other hand, is relatively inexpensive. Thus it would certainly not be absurd for Congress to have intended that a motion be treated differently from the initiation of an "action."

The Government argues, in essence, that to treat the current motion as outside the purview of the PLRA would allow prisoners to make an end-run around the exhaustion requirement. (*See* Gov't SAM Ltr. at 2) (citing *Porter v. Nussle,* 534 U.S. 516, 530, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)) ("It seems unlikely that Congress, when it included in the PLRA a firm exhaustion requirement, meant to leave the need to exhaust to the pleader's option.").[8] But the Government overreads *Porter* here. In that case, the Supreme Court interpreted the PLRA's term "prison conditions" to encompass isolated incidents of abuse by prison officials. Plaintiff's argument was that since his challenge was not to system-wide conditions, his was not literally about "prison conditions" generally. The "pleader's option" language was used by the Court to show that, given PLRA's goal of reducing prison suits, it would be unreasonable for a Plaintiff to have to exhaust if he alleged system-wide abuses, but not have to exhaust if he alleged a single incident. The concern of the Supreme Court about creative pleading is not present here.

The only other cases cited by the Government where the pretrial detainee was found to have to exhaust are distinguishable. *United States v. Al–Marri,* 239 F.Supp.2d 366 (S.D.N.Y.2002) held simply that the PLRA's exhaustion requirement applied to a pretrial detainee who asked to be released from the Special Housing Unit. The Court did not address the textual question presented here, i.e., whether a motion constitutes an "action." While the court in *United States v. Abu Ali,* 396 F.Supp.2d 703, 705 (E.D.Va.2005) found that exhaustion was required, that court reached the constitutional question never-

---

7. This is to be contrasted with the *motion* that is before the Court, a motion being "a written or oral application requesting a court to make a specified ruling or order." *Black's Law Dictionary* 1031 (7th Ed. 1999); *accord Ayala Lopez,* 327 F.Supp.2d at 141 n. 1.

8. "Gov't SAM Ltr." refers to the letter submitted by the Government in response to the Court's Order to Show Cause, sent to the Court on December 7, 2007.

theless. Therefore, the Court finds that subject matter jurisdiction exists because the PLRA does not govern the instant motion.

### 2. The SAMs Do Not Violate Defendant's Right to Counsel

■ Defendant's challenge is not to the length but to the conditions of his confinement. Both sides agree that the Court's constitutional analysis on this question is governed by *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). (Gov't SAM Mem. at 5; Def. SAM Reply Mem. at 1.) [9] To determine whether a prison regulation burdens fundamental rights, the Court must ask whether the regulation is "reasonably related to legitimate penological objectives, or whether it represents an exaggerated response to those concerns." *Id.* at 87, 107 S.Ct. 2254. Turner provides a four-factor test for evaluating such regulations. The Court "must consider first whether there is a valid, rational connection between the regulation and the legitimate governmental interest used to justify it; second, whether there are alternative means for the prisoner to exercise the right at issue; third, the impact that the desired accommodation will have on guards, other inmates, and prison resources; and fourth, the absence of ready alternatives." *United States v. El–Hage*, 213 F.3d 74, 81 (2d Cir.2000), (citing *Tur-*

*ner* 482 U.S. at 89–91, 107 S.Ct. 2254). The Court must find that there are legitimate penological interests served by the restrictions. *El Hage*, 213 F.3d at 82. In applying the *Turner* factors, the Court need not hold an evidentiary hearing, but may proceed by proffer. *Id.* at 82.

The Court has reviewed the material submitted which formed the basis for the Acting Attorney General's determination. After careful consideration, the Court finds that the Government has offered sufficient evidence for the Court to conclude that the SAMs are reasonably related to legitimate penological interests. In particular, the Court's determination rests on the evidence of the Defendant's willingness to provide aid to Al–Qaeda through his cell phone and use of his apartment; the Defendant's stated intention to overthrow the United States through whatever means necessary; [10] and the Defendant's threatening statements to British authorities. [11]

Applying the *Turner* factors to the record before it, the Court finds that the SAMs are constitutional. First, The Acting Attorney General requested that the BOP implement the measures because of the risk that Hashmi's communications could result in death or seriously bodily injury to other persons. The restrictions imposed are a rational means toward that legitimate penological objective. As for the second, third, and fourth *Turner* fac-

9. "Def. SAM Reply Mem." refers to the letter filed with the Court by Khurrum B. Wahid on November 23, 2007.

10. The Government proffers that the Defendant stated: "[W]e must not recognize any government authority, or any authority at all, besides Allah. We are not Americans. We are Muslims .... The Colonizers and masters against the oppressed, and we will burn down the master's house .... We reject the U.N., reject America, reject all law and order. Don't lobby Congress or protest because we don't recognize Congress. The only relationship you should have with America is to top-

ple it." *See* Letter of David Raskin, et. al to Honorable Loretta A. Preska, filed on December 3, 2007.

11. The Government proffers that at the time of his arrest, the Defendant stated that he was going to kill U.S. and British soldiers; that a particular jihad leader would "make the officers pay" for what they were doing to him; that the Muslim religion will take over; that "we are the sword of Allah," and that the arresting officers were crusaders, sons of monkeys, sons of pigs, and sons of dogs. *Id.*

tors, the Defendant does not advance any less restrictive means of achieving this goal, and the Government need not show that the SAMS are the least restrictive means of achieving the goal. *See Turner,* 482 U.S. at 90, 107 S.Ct. 2254 ("[P]rison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.") Therefore, the Court finds that the restrictions are reasonable under the circumstances. Similar restrictions on communications have been upheld in similar circumstances presented to Court of Appeals in *United States v. Felipe,* 148 F.3d 101 (2d Cir.1998) and in *El–Hage,* 213 F.3d at 81–82.

As for the requirement that the Defendant's attorney sign an acknowledgment of the SAMs, the Court finds that this too passes muster under *Turner.* Precisely the same provision was upheld by Judge Koetl in *United States v. Sattar,* 272 F.Supp.2d 348, 371–72 (S.D.N.Y.2003). Furthermore, requiring simply an acknowledgement of the SAMs, not an endorsement of them, asks considerably less of defense counsel than to undergo a security clearance, which the Court has already ordered.

The Court appreciates defense counsel's invitation to take judicial notice of the prosecution of Lynne Stewart for violating 18 U.S.C. § 1001, after signing the required SAM affirmation. But counsel would do well to avoid the conduct that formed the basis of that attorney's conviction—smuggling messages from her client to co-conspirators, despite acknowledging the SAMs that forbade her from doing so.

### III. *Conclusion*

The Court rejects the defendant's argument that CIPA is unconstitutional. Because of the sensitive nature of the information that will necessarily be disclosed in this case, the Court concludes that defense counsel are required to undergo a background check and obtain a security clearance before proceeding with discovery. The Government has met its burden of showing that the imposed SAMs are necessary to serve a legitimate penological interest and, therefore, are constitutional. For these reasons, Defendant's motions are DENIED.

SO ORDERED.