UNITED STATES of America,

v.

**Ahmed Khalfan GHAILANI, Defendant.**

**No. S1098 Crim. 1023(LAK).**

United States District Court, S.D. New York.

June 14, 2010.

---

31. *Id.*

32. *Id.*

Michael Farbiarz, Harry A. Chernoff, Nicholas Lewin, Sean S. Buckley, Assistant United States Attorneys, Preet Bharara, United States Attorney, Peter Enrique Quijano, Michael K. Bachrach, Steve Zissou, Attorneys for Defendant.

## MEMORANDUM OPINION

LEWIS A. KAPLAN, District Judge.

Ahmed Khalfan Ghailani, an alleged member of Al Qaeda, is charged with conspiring with Usama Bin Laden and others to kill Americans abroad by, among other means, bombing the United States Embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, bombings in which 224 people reportedly were killed. He first was indicted in this Court in 1998 for the charged crimes. He was captured abroad in 2004 by a foreign state and soon was turned over to the Central Intelligence Agency ("CIA"), which detained and interrogated him outside the United States for

roughly two years. He then was shifted to a secure facility at the United States naval base at Guantanamo Bay, where he remained until June 2009 when he was produced in this Court for prosecution on the federal indictment. From that arraignment until the present moment, Ghailani has been confined at the Metropolitan Correctional Center (the "MCC") in Manhattan awaiting trial on these federal charges.

In a sealed motion dated April 2, 2010, the defendant moved this Court for an order directing the Bureau of Prisons (the "BoP") to cease from employing its standard "visual search" procedure—referred to by the defense as a "body cavity search"—as a prerequisite to Ghailani's attendance at court proceedings in this case. The government opposes this motion on both procedural and substantive grounds. It argues first that the Court should not decide the merits because the defendant has failed to exhaust his administrative remedies. Second, the government contends that the defendant's motion fails on the merits because the standard search policy of which he complains serves legitimate penological interests and should not be disturbed by the Court.[1]

## I

The visual search procedure challenged by the defendant is a national BoP policy authorized pursuant to 28 C.F.R. § 552.11.[2] The policy, contained within a BoP program statement entitled "Searches of Housing Units, Inmates and Inmate Work Areas," dated June 30, 1997,[3] requires that all inmates entering or leaving the MCC be subjected to a "visual search."[4] This visual search involves "a visual inspection of all body surfaces and body cavities."[5] More specifically, as described by both the government and the defense, it requires the inmate to undress and to bend over or squat briefly in order to display his rectum to the officer conducting the search.[6] The government contends that the visual search policy described above is necessary in order adequately to protect inmates, prison and courtroom personnel, and the general public from the danger that an inmate may secrete weapons or other contraband in his body cavities.[7] It applies without exception to all inmates at the MCC.[8]

As one such inmate, Ghailani is subject to the general visual search policy and has been subjected to visual searches upon entering and leaving the MCC for court appearances. He claims, however, that on the first eight occasions on which he was subjected to a visual search after his transfer to New York, a modified search was employed in which he was directed to squat but was not required to "open himself" to allow a visual rectal cavity inspec-

---

1. Gov't Br., dated April 16, 2010, at 1.

2. *See* Haas Decl. ¶ 2.

3. *See* Haas Decl. Ex. A [hereinafter "BoP Program Statement"].

4. *See* BoP Program Statement at 3 ("Except in minimum security institutions, inmates must undergo a visual search when leaving the institution, for whatever reason (even when being released)."); Haas Decl. ¶ 2.

5. *See* BoP Program Statement at 2 (quoting 28 C.F.R. § 552.11(c)).

6. *See* Gov't Br. 3; Haas Decl. ¶¶ 2, 3; Def. Br. 4.

   This "visual search" is distinguished from the "[d]igital or simple instrument search," which involves "inspection for contraband or any other foreign item in a body cavity of an inmate by use of fingers or simple instruments" and may be conducted only by designated health personnel upon approval of the warden and upon reasonable suspicion. 28 C.F.R. § 552.11(d).

7. Haas Decl. ¶ 4.

8. *Id.* ¶ 2.

tion.[9] Ghailani claims that it was not until the ninth such occasion—in preparation for being brought to a meeting on or about November 3, 2009—that he was instructed to open himself in the manner to which he objects.[10] As a result of this incident, he refused to attend the meeting. He since has chosen not to attend all but one of the subsequent proceedings in his case rather than submit to the visual search procedure.

The Court conducted an evidentiary hearing on May 18, 2010. Dr. Katherine Porterfield, a clinical psychologist appointed to assist the defense team, then testified that the defendant suffers from post traumatic stress disorder ("PTSD") as a result of the treatment he received while in CIA custody, particularly the "enhanced interrogation techniques" which were applied to him during that time.[11] It is her clinical opinion that, as a result of these experiences, exposure of the defendant's rectal area—or even anticipation of such exposure[12]—triggers the defendant's PTSD and thus makes him unable to assist in his defense. The defendant chose not to testify on this matter at the hearing.[13] His moving papers, however, make clear that he seeks an order prohibiting only that part of the search procedure that involves visual observation of his rectal area and not the remainder of the BoP's visual search procedure.[14]

## II

The government argues first that the defendant's motion should be denied pursuant to the Prison Litigation Reform Act (the "PLRA") for failure to exhaust administrative remedies.[15] Under the PLRA, "no action shall be brought with respect to prison conditions under … Federal law, by a prisoner … until such administrative remedies as are available are exhausted." [16] If the PLRA applies to the defendant's motion, it must be denied because

---

9. *See* Def. Br., dated April 2, 2010, at 5 n. 2; Porterfield Decl. ¶ 17.

10. Reply Br., dated April 23, 2010, Ex. A [hereinafter "Ghailani Aff."] ¶¶ 14–16; *see also* Porterfield Decl. ¶ 17.

11. *See, e.g.,* May 18, 2010 Tr. at 8–12, 34.
    The Draft OMS Guidelines on Medical and Psychological Support to Detainee Interrogations describe "enhanced measures" as including: attention grasp, facial hold, insult (facial) slap, abdominal slap, prolonged diapering, sleep deprivation (over 72 hours), stress positions, cramped confinement, and waterboarding. *See* Bachrach Decl., dated May 6, 2010, Ex. 6 (Gov't Bates Number CP2009–00001562–73). Not all techniques were used on all CIA detainees. Information regarding which specific techniques were applied to Ghailani while in CIA custody remains classified.

12. *See, e.g.,* May 18, 2010 Tr. at 28–29 ("At this point the anticipation of the search appears to be quite activating for him and starts what I would say is this flood…. At this point the anticipation of the search has become fairly destabilizing for Mr. Ghailani as well.").

13. *See* May 6, 2010 Tr. at 4.

14. Both the defendant and Dr. Porterfield distinguish between the psychological effect on the defendant of a visual search of his body surfaces, which they claim he can tolerate, and a visual search of his body cavities, which they claim triggers a PTSD reaction that may render him incapable of assisting in his defense. *See, e.g.,* Def. Br. 22; Ghailani Aff. ¶¶ 17–18; May 18, 2010 Tr. at 28 (stating that she accepts Ghailani's self reporting that "the nudity is uncomfortable but he can tolerate it. It is the exposure of his rectal area that he cannot because it creates such fear in him after the flood of memories….").

    For purposes of deciding this motion, the Court assumes that this is a meaningful distinction and considers the defendant's motion as requesting that the BoP be prohibited from performing only that aspect of the standard visual search that involves visual inspection of his rectal cavity.

15. Gov't Br. 5.

16. 42 U.S.C. § 1997e(a).

Ghailani has not exhausted his administrative remedies.[17]

■ The defendant clearly falls within the PLRA's definition of "prisoner,"[18] and his motion seems to challenge "prison conditions"[19]—that is, application of the BoP's standard visual search procedure when he travels to or from court appearances. There is considerable disagreement within this and other circuits, however, as to whether a motion brought by a defendant within a criminal case, rather than as a civil suit, to challenge prison conditions is an "action" subject to the PLRA's exhaustion requirement.[20]

■ In light of this split in authority, and in the interests of avoiding unnecessary delay in adjudication of these matters, the Court finds it prudent simply to assume for purposes of argument that the PLRA's exhaustion requirement does not apply to the defendant's motion and to turn to its merits.[21]

## III

■ The defendant asserts that the BoP's visual search policy, as applied to him, violates his Sixth Amendment right to participate in his own defense because being subjected to the visual inspection of his rectal cavity would render him close to if not fully incapable of assisting counsel in his defense. Dr. Porterfield went even further, claiming that subjection to that aspect of the procedure in fact would render him incapable of assisting in his defense by triggering his PTSD,[22] although

---

17. The BoP maintains a grievance program, referred to as the Administrative Remedy Program (the "ARP") that involves four levels of review: (1) an informal request, *see* 28 C.F.R. § 542.13; (2) a formal request for decision by the warden, *see id.* §§ 542.11(a)(4), 542.14; (3) appeal to the regional office, *see id.* § 542.15; and (4) appeal to BoP's Central Office, *see id.* § 542.15.

At the time the defendant's motion was filed, he had not attempted even the first step in the ARP process. At oral argument on May 18, 2010, defense counsel represented to the Court that, as of that time, the defendant had completed the first step in this process. *See* May 18, 2010 Tr. at 182. (This portion of the hearing was conducted in closed session and the transcript remains classified pending review.)

18. *Id.* § 1997e(h) ("As used in this section, the term 'prisoner' means any person incarcerated or detained in any facility who is accused of ... violations of criminal law....").

19. *See Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) ("[W]e hold that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.").

20. *Compare United States v. Khan,* 540 F.Supp.2d 344 (E.D.N.Y.2007) (defendant's motion to be released from the Special Housing Unit was subject to PLRA exhaustion requirement); *United States v. Al–Marri,* 239 F.Supp.2d 366 (S.D.N.Y.2002) (assuming same) *with United States v. Hashmi,* 621 F.Supp.2d 76, 84–86 (S.D.N.Y.2008) (PLRA did not govern defendant's motion challenging the Special Administrative Measures because motion in criminal case was not an "action"); *United States v. Ayala Lopez,* 327 F.Supp.2d 138, 140–42 (D.P.R.2004) (PLRA exhaustion requirement inapplicable because defendant's motion was not an "action" within statute's meaning).

21. As the Supreme Court recently clarified, the PLRA's exhaustion requirement is not jurisdictional. *See Woodford v. Ngo,* 548 U.S. 81, 101, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ("[Section] 1997e(c)(2) [of the PLRA] still serves a useful function by making it clear that the PLRA exhaustion requirement is not jurisdictional, and thus allowing a district court to dismiss plainly meritless claims without first addressing what may be a much more complex question, namely, whether the prisoner did in fact properly exhaust available administrative remedies.").

22. May 18, 2010 Tr. at 44.

she declined to offer an opinion as to whether the defendant currently is incompetent to stand trial.[23]

The government has not directly contradicted Dr. Porterfield's assessment of the defendant's condition. Nonetheless, it argues that the defendant's motion fails on the merits because the uniform prison regulation at issue is reasonable and serves important governmental interests.

■ A clearly established standard governs this inquiry:

"[T]he proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is 'reasonably related to legitimate penological interests.' This is true even when the constitutional right claimed to have been infringed is fundamental.... [The reasonableness test] appl[ies] in all cases in which a prisoner asserts that a prison regulation violates the Constitution, not just those in which the prisoner invokes the First Amendment. We made quite clear that the standard of review adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights."[24]

This test is intended to reconcile the Court's "longstanding adherence to the principle that inmates retain at least some constitutional rights despite incarceration with the recognition that prison authorities are best equipped to make difficult deci-

sions regarding prison administration."[25] Consequently, "the burden is upon the prisoner to show that a challenged prison regulation is unreasonable,"[26] and this burden is particularly "heavy" when the regulation relates to security considerations.[27]

■ In deciding whether a prison regulation alleged to violate a defendant's constitutional rights is "unreasonable," a court must consider four factors:

"First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it? Second, are there alternative means of exercising the right that remain open to prison inmates? Third, what impact will accommodation of the asserted constitutional right ... have on guards and other inmates, and on the allocation of prison resources generally? And, fourth, are ready alternatives for furthering the governmental interest available?"[28]

The first and third factors strongly favor the government for similar reasons. There is a "valid, rational connection" between the BoP's visual search policy and the government's stated interest in ensuring the safety of guards, court personnel, and other inmates. The policy was adopted at the national level in recognition of "the substantial danger that inmates will secrete weapons or other contraband in body cavities."[29] This is a perfectly reasonable concern in light of both previous experiences with federal prisoners obtaining or

---

23. *Id.* at 48–49.

24. *Washington v. Harper*, 494 U.S. 210, 223–24, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (citations omitted) (quoting *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

25. *Id.*

26. *Covino v. Patrissi*, 967 F.2d 73, 79 (2d Cir.1992).

27. *Bell v. Wolfish*, 441 U.S. 520, 562, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

28. *Beard v. Banks*, 548 U.S. 521, 529, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006) (quotation marks and citations omitted).

29. *See* Haas Decl. ¶¶ 2, 3, 4.

fashioning weapons[30] and common sense. It has been found by other courts to justify similar search procedures.[31] For substantially the same reasons, the third factor favors the government as well. The government entity best equipped to assess the value and efficacy of this search procedure has deemed it necessary in all cases in which an inmate enters or leaves the MCC.[32] Accommodating Ghailani's request by foregoing visual searches of the defendant's body cavities would risk the safety of guards, other inmates, and court personnel by creating opportunities for the defendant to secrete weapons or contraband in his person.

The fourth factor too favors the government. The defendant argues that a variety of other security procedures already employed with respect to the defendant adequately protect the same security interest as would visual inspection of his body cavities.[33] Having considered the defendant's various arguments in this vein, the Court is not convinced that the existing procedures to which the defense points

render the challenged policy unnecessary or superfluous. Notwithstanding defense counsel's assertions to the contrary,[34] the government has made a credible showing that ready alternatives are not available to protect this important security interest.[35]

The second factor—whether alternative means of exercising the allegedly infringed right are open to the defendant—is somewhat more complicated than the other factors because the "right" at issue has not clearly been identified. The defendant alleges that the challenged practice "so traumatizes him that it undermines his ability to participate in his own defense and as such violates his Fifth and Sixth Amendment rights, as applied."[36] A defendant, of course, has the right to assist in his defense.[37] Moreover, if he is not able to participate in his defense, then he by definition is incompetent to stand trial.[38] If Dr. Porterfield is correct that subjecting him to visual inspection of his body cavities will render Ghailani unable effectively to participate in his defense, then it will render him incompetent to stand trial. In

---

**30.** *See id.* ¶ 4.

**31.** *See, e.g., Bell*, 441 U.S. at 558–60, 99 S.Ct. 1861 (finding procedure of visual body cavity search following contact visits to be reasonably related to and justified by security concerns).

**32.** *See* Haas Decl. ¶ 2, 3, 4.

**33.** *See* Reply Br. 7–9 (discussing use of the following procedures: 24–hour solitary confinement, no contact visits, "three man hold" and use of cuffs and shackles for transport, and one-piece jumpsuits that zip in the back).

**34.** *See, e.g.,* May 18, 2010 Tr. at 161–67, 172–75.

**35.** *See* Haas Decl. ¶ 5 ("I am aware of no ready alternatives to visual searches, other than possibly the use of a body-scan machine. Use of that machines has not been approved for the MCC by the BoP, and there are no current plans to acquire one.").

**36.** Def. Br. 5; *see also id.* at 28 ("[T]he Due Process right to a fair trial under Fifth Amendment is at risk of being rendered a farce if Ghailani's ability to assist in his own defense, itself protected by the Sixth Amendment, is hindered by what are in essence Fourth Amendment concerns.").

**37.** *See Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ("[T]he accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal . . . .").

**38.** *See Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial.").

that circumstance, his Sixth Amendment right will not be violated because he will be treated as provided for by statute[39] and will not be tried until he again is able to assist in his defense. If, on the other hand, Ghailani remains able sufficiently to participate in his defense notwithstanding being subjected to the full search procedure, then his Sixth Amendment right likewise will not have been violated. Either way, the defendant's rights would be protected adequately.

In light of the above *Beard* analysis, and even assuming the truth of all of Dr. Porterfield's testimony, which the Court does not now either accept or reject, the defendant is not entitled to relief. He has not "met [his] heavy burden of showing that these officials have exaggerated their response to the genuine security considerations that actuated these restrictions and practices."[40] The challenged prison regulation—namely, the requirement of visual inspection of defendant's body cavities as part of a standard visual search performed whenever he travels to or from court—is justified by the legitimate governmental interest in protecting the safety of prison and court personnel and other inmates. The Court's intervention in this matter would be inappropriate.

### IV

Accordingly, the defendant's motion for an order directing the BoP to cease and desist from employing "body cavity searches" as a prerequisite to his attendance at court appearances in the instant case is denied.

SO ORDERED.

---

**39.** *See* 18 U.S.C. §§ 4241(d), 4246.

**40.** *Bell v. Wolfish*, 441 U.S. 520, 561–62, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).