**UNITED STATES of America,**
**Plaintiff,**

v.

**Alhassane Ould MOHAMED,**
**Defendant.**

**No. 13–CR–0527 (WFK).**

United States District Court,
E.D. New York.

Signed May 1, 2015.

---

Douglas G. Morris, Mildred M. Whalen, Federal Defenders of New York, Inc., Brooklyn, NY, for Defendant.

Zainab Ahmad, Celia Cohen, Samuel P. Nitze, United States Attorneys Office for the Eastern District of New York, Brooklyn, NY, for Plaintiff.

WILLIAM F. KUNTZ, II, District Judge:

Alhassane Ould Mohamed ("Defendant"), also known as "Cheibani," was indicted on September 13, 2013 for one count of murder of an internationally protected person and one count of attempted murder of an internationally protected person. Dkt. 1 ("Indictment"). Defendant was arrested in Mali on November 25, 2013 and has been detained in the Metropolitan Correctional Center in Manhattan, New York, since March 12, 2014 while awaiting trial. On July 15, 2014, the United States Attorney General issued Special Administrative Measures ("SAMs") governing Defendant's conditions of detention. On January 29, 2015, Defendant filed a motion *in limine* to vacate the Special Administrative Measures in full or, in the alternative, to vacate or modify various sections of the SAMs. Dkt. 29–1 ("Def.Mot.") For the reasons stated below, Defendant's motion to vacate or modify the Special Administrative Measures is DENIED in its entirety.

## BACKGROUND

### Defendant's Personal Background

Defendant is a forty-four-year-old man born in Gao, Mali. Def. Mot. Ex. U at 1.

He has had no formal education and says he cannot read, write, or calculate. *Id.* at 2. He speaks French and Arabic, but no English. Def. Mot. at 11. He has at various times worked as an apprentice to his father (who was an administrator for forest protection services), as a chauffeur, and as a car and cattle dealer. *Id.* at 2. His right lung collapsed in March or April of 2007, leaving him with only one lung. Def. Mot. Ex. J at 2.

Defendant's living relatives include a mother, children, and siblings, all in Mali. Def. Mot. Ex. J at 1–2.

**Defendant's Alleged Crimes**

Defendant is accused of perpetrating an attack against an American Embassy official in Niamey, Niger on December 23, 2000. Def. Mot. Ex. A at 2. On that date, William Bultemeier, Defense Attaché Systems Coordinator at the U.S. Embassy in Niamey, was leaving a Niamey restaurant and approaching his diplomatic vehicle. *Id.* Defendant allegedly accosted Bultemeier with a pistol, accompanied by an accomplice[1] carrying an AK–47. *Id.* Defendant allegedly demanded that Bultemeier turn over the keys to the car, but when Bultemeier did not obey, Defendant shot him. *Id.* When Staff Sergeant Christopher McNeely came to Bultemeier's aid, Defendant's accomplice allegedly fired the AK–47 at both McNeely and Bultemeier. *Id.* Defendant and the accomplice allegedly took Bultemeier's keys from his pockets and drove away in Bultemeier's diplomatic vehicle. McNeely survived after medical evacuation from Niger. *Id.* Bultemeier died from the gunshot wounds. *Id.*

Defendant and his accomplice allegedly drove the stolen diplomatic vehicle to Gao, Mali. *Id.* On December 26, 2000, Malian police discovered the vehicle in Timbuktu, Mali, at which point Defendant's DNA allegedly was discovered in the vehicle. *Id.*

Malian police searched Defendant's home in Gao, and discovered a hidden pistol and items allegedly taken from the stolen vehicle. *Id.* Thereafter, Defendant was taken into Malian custody. However, in May 2002, after being detained for nearly a year and a half, Defendant allegedly escaped from Malian custody during a medical visit. *Id.*

On September 13, 2013, Defendant was indicted by a grand jury in the Eastern District of New York for the murder of Bultemeier and attempted murder of McNeely. *Id.* French military forces apprehended Defendant in northern Mali on November 25, 2013. *Id.* After his arrest, Defendant was turned over first to Malian authorities and then to the Federal Bureau of Investigations ("FBI"). Def. Mot. at 4. Once in FBI custody, Defendant was flown to New York to face the indictment charge. *Id.*

**Defendant's Alleged Terrorist Connections**

The Government alleges Defendant was part of a December 2009 attack on Saudi Arabian officials in Niger, for which he was sentenced to twenty years in prison in Niger. Def. Mot. Ex. A at 2. Defendant allegedly escaped from the prison in Niger in June 2013, accompanied by approximately twenty-one other inmates. The inmates allegedly coordinated with members of the Nigeria-based terrorist group Boko Haram to launch an attack on the prison that killed three guards. *Id.* at 3. The Government also claims Defendant admitted to being a member of the National Movement for the Liberation of Azawad ("MNLA"), a rebel group that has attacked the governments of Niger and Mali. *Id.* Defendant was allegedly traveling with three armed members of MNLA at the

---

**1.** The name or identity of the accomplice is unknown.

time of his 2013 arrest by French forces. *Id.*

The Government further alleges that Defendant informed FBI agents he was close childhood friends with several leaders of the Movement for Unity and Jihad in West Africa ("MUJAO") but had not been in recent contact with them. *Id.* The Government, citing the United States Department of State's (the "State Department") classification, describes MUJAO as a "splinter group" of al-Qaeda in the Islamic Maghreb ("AQIM"); MUJAO is responsible for several violent attacks in the Sahel region, including the abduction of aid workers and diplomats. *Id.*

Furthermore, according to the Government, Defendant has also admitted to knowing Mokhtar Belmokhtar, the leader of the "al-Qaeda controlled designated terrorist group" the al-Mulathamun Battalion, which claimed responsibility for a January 2013 attack on an Algerian gas facility that killed 38 people. *Id.* The Government, citing the State Department's account, claims that MUJAO merged with the al-Mulathamun Battalion in August 2013 to create a new group called al-Murabitoun. *Id.* at 3–4. Defendant allegedly had contacts on both sides of the merger between the organizations.

Defendant argues that the Government relies almost entirely on "guilt by association" to allege most of the aforementioned terrorist affiliations. Def. Mot. at 7. The Government does not show, or even allege, that Defendant is or was a member of MUJAO, AQIM, the al-Mulathamun Battalion, or al-Murabitoun. The only group of which the Government alleges Defendant is a member is the MNLA; it further alleges Defendant "was traveling with three armed members" of the MNLA when he was arrested in 2013. Def. Mot. Ex. A at 3. However, Defendant argues

the MNLA differs from the other groups to which the Government attempts to link Defendant in one key way: it has not been designated a foreign terrorist group by the State Department,[2] and its political goals are local and secular rather than global and motivated by religious fanaticism. Def. Mot. at 7; Def. Mot. Ex. X. Defendant argues that the MNLA is a separatist movement by the Tuareg, a particular ethnic group of "semi-nomadic pastoralists of North African Berber origin" in the northern and western Sahara. Def. Mot. at 7. Thus, of the militant groups referenced by the Government, Defendant argues the only one for which the Government alleges a connection to Defendant beyond acquaintanceship with high-ranking members has a local rather than global agenda.

## The Special Administrative Measures

On July 15, 2014, the United States Attorney General ("USAG") requested the Director of the Federal Bureau of Prisons to impose Special Administrative Measures ("SAMs") upon Defendant. Def. Mot. Ex. A. The stated purpose of the SAMs is to prevent Defendant from having "communications or contacts with people inside or outside of the prison" that "could result in death or serious bodily injury, or substantial damage to property that would entail the risk of death or serious bodily injury." 28 C.F.R. § 501.3(a). The SAMs include incarceration in the Special Housing Unit (the "SHU") at the Metropolitan Correctional Center ("MCC") in Manhattan, New York. Def. Mot. at 3. Before meeting with Defendant, Defense Counsel and their staff were required to sign an affirmation acknowledging receipt of the SAMs and agreeing to abide by the SAMs' provisions. Def. Mot. Ex. A. at 5–6. Violation of the SAMs can give rise to criminal liability. *See, e.g., United States v. Stewart,* 590 F.3d 93, 98–99, 102–103 (2d Cir.2009) (af-

---

2. *See* http://www.state.gov/j/ct/rls/other/des/ 123085.htm.

firming conviction of attorney Lynne Stewart and translator Mohammed Yousry for conspiracy to defraud the United States by violating SAMs after agreeing to abide by them).

Defense Counsel objected to several provisions of the SAMs in a letter dated October 8, 2014. Def. Mot. Ex. D. The USAG modified the SAMs on November 14, 2014, and again on December 12, 2014. Def. Mot. Exs. A, B, C. However, the modifications failed to satisfy Defendant's objections. The chief objections currently at issue concern Defendant's right to effective representation by counsel and Defendant's allegedly extreme isolation. Def. Mot. Ex. D.

**Defense Motion *in Limine***

On January 29, 2015, Defense Counsel filed a motion *in limine* (the "Motion") to vacate the SAMs in full or, in the alternative, to vacate or modify the various sections of the SAMs. Defense Counsel argue the SAMs violate the regulatory basis of 28 C.F.R. § 501.3 because they do not serve their stated purpose of preventing from having communications that could result in serious bodily injury. Def. Mot. at 5–9, 22–25. Defense Counsel argue the SAMs subject Defendant to extreme conditions of solitary confinement, which are both unnecessary and cruel. *Id.* at 10–15. For example, currently, Defendant suffers "intermittent hallucinatory experiences" brought on by his "extreme isolation" in prison. Def. Mot. Ex. U at 2. Defense Counsel also argue the SAMs violate the First, Fifth, and Sixth Amendments. Def. Mot. at 28–39. The Government opposes the Motion in its entirety. Dkt. 36 ("Opp. Mot."). Defense Counsel filed a memorandum replying to the Government's opposition on April 17, 2015. Dkt. 41 ("Def. Reply"). The Court considers each request from Defense Counsel in turn.

## ANALYSIS

### I. The Court has Jurisdiction to Entertain the Motion.

 The Government argues that under the Prison Litigation Reform Act ("PLRA"), the Court lacks jurisdiction to entertain the Motion because Defendant has failed to exhaust his administrative remedies. Opp. Mot. at 10–11; 42 U.S.C. § 1997e.

Pursuant to the PLRA, "[n]o action shall be brought with respect to prison conditions ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Government's position is incorrect because the PLRA exhaustion requirement only applies to "actions." In *United States v. Hashmi*, 621 F.Supp.2d 76, 85 (S.D.N.Y.2008) (Preska, J.), the District Court for the Southern District of New York explained that a motion *in limine* by a pretrial detainee does not constitute an "action" for the purposes of the PLRA:

In light of the purposes of the PLRA, an action is best understood as a civil or criminal judicial proceeding. The Court finds that this definition constitutes the plain meaning of the statutory language, a meaning that should be given effect unless it would create an absurd result. Finding that the current motion is not an "action" would not lead to an absurd result. Congress's clear purpose in enacting the PLRA, as the Supreme Court has recognized, was to reduce the quantity of lawsuits related to prison conditions. The initiation of a new lawsuit is certainly a more costly process than an application for a specific ruling or order brought to a court in the context of an already-pending action. A new lawsuit requires, *inter alia,* the assignment of a Judge; the effectuation of service on the

Government; a formal answer from the Defendant; the briefing of a motion to dismiss or for summary judgment, etc. This is a costly process. A motion by a pretrial detainee, on the other hand, is relatively inexpensive. Thus it would certainly not be absurd for Congress to have intended that a motion be treated differently from the initiation of an action.

*Id.* (internal quotation marks and citations omitted). In other words, a pretrial detainee need not exhaust administrative remedies before filing a motion *in limine* in federal court because such a motion is not an "action" for PLRA purposes.

Nonetheless, the Government argues the Second Circuit has held that a district court does not have jurisdiction over a pretrial defendant's motion *in limine* to vacate or modify SAMs. Opp. Mot. at 12. However, the cases the Government uses to support its argument concern lawsuits and appeals initiated by inmates. Such cases are distinguishable from motions filed by pretrial detainees in government-initiated actions. *Hashmi,* 621 F.Supp.2d at 85.

For example, the Government cites *United States v. Yousef,* 327 F.3d 56, 165 (2d Cir.2003). However, in *Yousef,* the prisoner was not a pretrial detainee. Rather, he was an individual convicted by a jury, appealing his conviction and challenging the Bureau of Prison's decision to follow the district court's recommendation regarding the conditions of his confinement. *Id.* Similarly, *United States v. Ali,* 528 F.3d 210, 244 (4th Cir.2008) concerned a convicted prisoner filing an appeal and challenging the SAMs as an improper additional sentence. *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), and *Booth v. Churner,* 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001), concerned inmates who had filed suit under 41 U.S.C. § 1983 claiming constitution-

al violations, while *Yousef v. Reno,* 254 F.3d 1214 (10th Cir.2001) concerned a *Bivens* action by an inmate. The aforementioned cases all involved lawsuits and appeals initiated by inmates, which clearly fall within the purview of the PLRA's exhaustion requirement.

The Court cannot say the same of motions filed by pre-trial detainees in government-initiated actions. *See, e.g., Hashmi,* 621 F.Supp.2d at 84–86; *see also In re Nagy,* 89 F.3d 115, 117 (2d Cir.1996) (distinguishing, for PLRA purposes, between a prisoner seeking a writ of mandamus as a substitute for filing a § 1983 action and a prisoner seeking a writ of mandamus directed to a judge conducting a criminal trial).

The Court finds the review conducted by the District Court for the Eastern District of Pennsylvania in *United States v. Savage,* 07–550–03, 2010 WL 4236867 at *4–6 (E.D.Pa. Oct. 21, 2010) (Barclay Surrick, J.) to be particularly on point. After collecting cases, the *Savage* Court found that "every court that has considered the issue has found that a motion to remove SAMs that is filed pre-trial in a defendant's criminal case is not an 'action' to which the PLRA applies." *Id.* Some courts outside the Second Circuit have *assumed* that such a motion is an "action" under the PLRA, but have not actually considered the question. *Id.* (citing as examples *United States v. Ali,* 396 F.Supp.2d 703 (E.D.Va.2005)) (Lee, J.) and *United States v. Troya,* 06–CR80171, 2008 WL 2537145 (S.D.Fl. Jun. 24, 2008) (Vitunac, Mag. J.).

The Court agrees with the *Hashmi* court and with the review conducted by the *Savage* court. A motion filed by a pretrial detainee in a criminal case, unlike a civil case or criminal appeal initiated by a prisoner, is not an "action" for PLRA purposes. *Hashmi,* 621 F.Supp.2d at 84–86. Considering it as such would not serve the

purposes of the PLRA. *See, e.g., id.; see also Sattar v. Gonzales,* 07–CV–02698, 2010 WL 685787 at *2 (D.Colo. Feb. 23, 2010) (Mix, Mag. J); *Ayyad v. Gonzales,* 05–CV–02342, 2008 WL 203420 at *3–4 (D.Colo. Jan. 17, 2008) (Daniel, J.), *aff'd on this issue on reconsideration,* 05–CV–02342, 2008 WL 2955964 at *1 (D.Colo. Jul. 31, 2008) (Daniel, J.).

The *Savage* court also emphasized that the PLRA would not bar challenges to SAMs conditions that "directly and necessarily affect [the court's] ability to give [the detainee] a fair and speedy trial." *Savage,* 2010 WL 4236867 at *6. The Court finds this reasoning persuasive and relevant because Defendant has raised issues pertaining to his right to counsel and has alleged the existence of conditions that could cause his incompetence to stand trial. Def. Mot. 2–3. These issues "directly and necessarily affect" the Court's ability to give Defendant a "fair and speedy trial." *Id.*

Therefore, for the reasons explained above, the Court finds it has jurisdiction to entertain this motion. The Court will now turn to Defendant's substantive arguments.

## II. Defendant's Restricted Communications and Confinement to the SHU Serve Legitimate Penological Purposes.

Defense Counsel first move the Court to "vacate the [SAMs], to release [Defendant] from the SHU, and to place him in the general prison population[.]" Dkt. 29 ("Notice of Def. Mot.") at 1.

The Supreme Court in *Turner v. Safley,* 482 U.S. 78, 89–91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), established the standard of review for constitutional challenges to prison regulations: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. 2254. *Turner* lists four factors to guide a court's inquiry into whether a regulation is valid. First, the regulation must have a rational (rather than a remote) connection to a legitimate and neutral government objective. *Id.* at 89–90, 107 S.Ct. 2254. Second, courts should look at whether inmates have alternative means of exercising the constitutional right at issue; the existence of alternative means weighs in favor of deferring to corrections officials' decisions that a certain means may be prohibited. *Id.* at 90, 107 S.Ct. 2254. Third, courts should consider the impact of the requested accommodation on guards, other inmates, and allocation of prison resources. *Id.* Finally, the existence of obvious alternatives to the regulation suggests that the regulation is not reasonable but responds to an "exaggerated" concern, while the absence of alternatives weighs in favor of deference to corrections officials. *Id.* at 90–91, 107 S.Ct. 2254.

When the challenge to a regulation comes from a pretrial detainee afforded the presumption of innocence, "the legitimate penological interests served [by the regulation] must go beyond the traditional objectives of rehabilitation and punishment[ ]" as the Government has no legitimate interest in the punishment or rehabilitation of a person presumed innocent. *United States v. El–Hage,* 213 F.3d 74, 81 (2d Cir.2000) (internal quotations and citations omitted). However, while the government may have different interests with respect to a pre-trial detainee than with respect to a convicted prisoner, the steps of a *Turner* review of a pretrial detainee's challenges remain the same. *Id.* at 81–82, 107 S.Ct. 2254.

In the instant case, all of the *Turner* factors weigh against striking the SAMs in their entirety. The SAMs, while undeniably burdening Defendant's First

Amendment rights to freedom of speech and association and having implications for his Fifth and Sixth Amendment rights to due process and counsel, have a rational connection to a legitimate government objective. First, the Government has a legitimate interest in preventing Defendant from coordinating any violent attack—whether upon his fellow inmates, prison guards, or anyone else—with other inmates or people outside the prison. This interest is explicitly recognized in 28 C.F.R. § 501.3(a). As discussed above, Defendant allegedly has broken out of two separate prisons, once in Mali in 2002 and once in Niger in 2013. Opp. Mot. at 4. The 2013 escape was allegedly coordinated between Defendant, other inmates, and militants outside the prison, including members of Boko Haram. *Id.* at 4–5. Defendant and his cohorts also allegedly killed three prison guards in the course of this escape. *Id.* Moreover, Defendant allegedly has admitted allegiance to the MNLA and has close personal ties to leaders of MUJAO, AQIM, and al-Murabitoun. *Id.* at 5–7. Thus, Defendant's restricted communications and incarceration in the SHU, away from the general prison population, have a rational connection to preventing Defendant from coordinating violent attacks. This includes preventing Defendant from sending coded communications to co-conspirators outside the prison. *See, e.g., United States v. Felipe,* 148 F.3d 101, 110–111 (2d Cir.1998).

Defense Counsel argue the SAMs are inappropriate because they are not "prisoner-specific." Def. Mot. at 26; *United States v. Reid,* 214 F.Supp.2d 84, 87 (D.Mass.2002) (Young, J.). Citing *Stewart,* 590 F.3d at 101–103, *In re: Basciano,* 542 F.3d 950 (2d Cir.2008), and *United States v. Tsarnaev,* 13–CR–10200 (D.Mass.2013), Defense Counsel point to cases where identical SAMs have been imposed upon prisoners who have solicited violence while incarcerated. Def. Mot. at 26–27. Defense Counsel argue that since Defendant has not solicited any such violence while incarcerated, treating him identically to those inmates who have solicited violence renders the SAMs insufficiently prisoner-specific. *Id.* at 28.

Defense Counsel's argument fails because it presumes Defendant must solicit violence while incarcerated before SAMs may be imposed. On the contrary, the very purpose of the SAMs is to *prevent* Defendant from soliciting violence while incarcerated. *See* 28 C.F.R. § 501.3(a). The USAG need not wait for a defendant to put out a hit on cooperating witnesses, Assistant U.S. Attorneys, or federal judges—as happened in *Basciano,* 542 F.3d 950—before imposing SAMs. In the instant case, Defendant's alleged history prior to his incarceration in the United States is sufficient to justify SAMs.

Defense Counsel argue the Government's allegations "fail to show that [Defendant] could carry out a jail-break an ocean away from northern Africa in New York City." Def. M at 7–9. Defense Counsel point out the difference between Niger (with its poverty, corruption, and weak institutions) and New York City, and note Defendant's alleged ties are all to northern African groups with a local focus. *Id.* These claims are accurate, but do not alter the fact that Defendant allegedly has experience with coordinating and committing large-scale violence even while incarcerated. Defendant may have greater scope for violence in Niger than in New York City, but the Government is nevertheless perfectly reasonable to think he still poses a significant threat while incarcerated here.

Second, the other *Turner* factors also weigh against the Court vacating all of the SAMs. Defendant's asserted rights to counsel and to humane treatment can be addressed without vacating the SAMs at all, as discussed further below. Releasing

Defendant into the general population could put other inmates and prison guards at risk, and preventing him from causing harm, or from being harmed himself, could unduly burden prison resources. Furthermore, the Court does not see any obvious alternative means of addressing the Government concerns. The Court notes that SAMs have been upheld in this Circuit for pre-trial detainees in terrorism-related cases for similar reasons to the Government's rationale for the SAMs in the instance case. *El–Hage*, 213 F.3d at 81–82. Therefore, the Court denies Defendant's motion to vacate the SAMs, release Defendant from the SHU, and have him placed in the general population.

The Court will now turn to Defense Counsel's objections to specific aspects and provisions of the SAMs.

### III. Section 2 of the SAMs: Attorney–Client Provisions

Defense Counsel argue "the government puts severe limits on the defense … even though the [USAG] does not claim any reasonable suspicion for believing that the [D]efendant might use his attorneys to further or facilitate acts of terrorism." Def. Mot. at 22 (internal citations and quotation marks omitted). Because of this, Defense Counsel argue Section 2 ("Attorney–Client Provisions") of the SAMs should be vacated. *Id.* at 23–26.

Defense Counsel correctly state that "the regulatory basis for SAMs envisions two types of restrictions" upon prisoners. *Id.* at 22. The first type, imposed pursuant to 28 C.F.R. § 501.3(a), requires a "substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons" and permits "housing the inmate in administrative detention and/or limiting certain privileges[.]" 28 C.F.R. § 501.3(a). The second type of restriction, imposed pursuant to 28 C.F.R. § 501.3(d), requires

the Attorney General to make a specific finding that "reasonable suspicion exists to believe that a particular inmate may use communications with attorneys or their agents to further or facilitate acts of terrorism[.]" 28 C.F.R. § 501.3(d). This provision permits "monitoring or review of communications between that inmate and attorneys or attorneys' agents who are traditionally covered by the attorney-client privilege[.]" *Id.*

However, most of Section 2 of the SAMs concerns topics such as requiring attorneys to affirm receipt of the SAMs and setting conditions for Defendant's legal visits and telephone calls. *See* Def. Mot. Ex. A at 5. These requirements and conditions are valid because they have a rational connection to legitimate Government objectives, as described in Section II above. Therefore, the Court denies Defendant's motion to strike Section 2 of the SAMs in its entirety.

In the alternative, Defense Counsel request the Court to strike specific provisions in Section 2. For example, Defense Counsel argue that specific provisions in Section 2 allow the Government to monitor attorney-client communications, prevent Defense Counsel from sharing information about Defendant with his family, and prevent Defense Counsel from mounting an effective defense. Def. Mot. at 23–26. The Court will address each specific provision of Section 2 in turn.

### A. Monitoring of Attorney–Client Communications

Defense Counsel specifically object to Footnotes 4 and 5 to Sections 2(g)(ii)(3)(a) and 2(g)(ii)(3)(d) of the SAMs as allowing "monitoring or review" of attorney-client communications in violation of the attorney-client privilege. Def. Mot. at 25; Def. Mot. Ex. D at 5–6. 28 C.F.R. § 501.3(d) only permits monitoring or review of attor-

ney-client communications upon a specific order from the USAG "based on information from the head of a federal law enforcement or intelligence agency that reasonable suspicion exists to believe that a particular inmate may use communications with attorneys or their agents to further or facilitate acts of terrorism." 28 C.F.R. § 501.3(d). Here, the USAG has made no such order, nor does the Government allege any such reasonable suspicion. Thus, these provisions of the SAMs can only be upheld if they do not allow "monitoring or review."

Section 2(g)(ii)(3)(a) of the SAMs, under the heading "Inmate's Initiation of Legally Privileged Telephone Calls," states that "[n]o telephone call/communication, or portion thereof," except as specifically authorized elsewhere in the SAMs, "[i]s to be overheard by a third party." Footnote 4 to that section states that "[f]or the purposes of the SAMs, 'third party' does not include officials of the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities when acting in connection with their official duties. This section does not allow monitoring of attorney-client privileged communications." Def. Mot. Ex. A at 8. Similarly, Section 2(g)(ii)(3)(d) of the SAMs says no telephone call or communication "[s]hall be in any manner recorded or preserved"—but, in Footnote 5, exempts "the USMS/ BOP/DF, FBI, DOJ, or other duly authorized federal authorities. This section does not allow monitoring of attorney-client privileged communications." *Id.* at 9. Moreover, the Government concedes it "does not interpret the SAMs to permit the monitoring of privileged attorney-client communications." Def. Mot. Ex. F at 3.

Because the exemptions in Footnotes 4 and 5 of Sections 2(g)(ii)(3)(a) and 2(g)(ii)(3)(d) explicitly do not allow for monitoring of attorney-client communications, the Court denies Defense Counsel's request to strike Footnotes 4 and 5 of Sections 2(g)(ii)(3)(a) and 2(g)(ii)(3)(d) of the SAMs.

## B. Sharing Information about Defendant with his Family

■ Section 2(a) of the SAMs states that "in signing the affirmation [acknowledging awareness of and agreeing to comply with the SAMs provisions], the inmate's attorney and precleared staff acknowledge the restriction that they will not forward *third party messages* to or from the inmate." Def. Mot. Ex. A at 6 (emphasis added). Defense Counsel argue the term "messages" is undefined, thereby providing Defense Counsel with insufficient notice about what conduct is prohibited. Def. Mot. at 25; Def. Mot. Ex. D at 2. Defense Counsel further argue the prohibition on "third party messages" is overly broad and could prevent them from informing Defendant's family members about "the basics about his well-being," such as his health and spirits, sending them his love, or letting them know he wants them to deposit money in his commissary account. Def. Mot. at 25; Def. Mot. Ex. D. at 3.

The Government responds that the term "messages" is clear and not overly broad because "observations about the [Defendant] can certainly be shared with his family, however, specific messages (i.e. verbal, written or recorded communications) cannot be shared with third parties[.]" Opp. Mot. at 18. The Government has advised Defense Counsel that observations about Defendant's wellbeing "do not constitute the forwarding of third-party messages within the meaning of the relevant SAMs provisions. However, [D]efense [C]ounsel may not forward personal messages from the [D]efendant to third parties." Opp. Mot. Ex. C at 2.

The Court finds that the SAMs' prohibition on "forward[ing] third party messages" is sufficiently clear to inform Defense Counsel about what conduct is barred. As the Government states, the plain meaning of "message" is a "verbal, written or recorded communication[ ]." Opp. Mot. at 18. The plain meaning of "forwarding" a message is passing it on without alteration. The Court finds that the SAMs would clearly prohibit Defense Counsel from telling Defendant's relatives, "He says he loves you," while clearly *not* prohibiting Defense Counsel from saying, "I think he misses you" or "he seems to be missing you." The latter two statements would fall into the category of observations by Defense Counsel rather than a message originating from Defendant.

Having found that the prohibition on forwarding messages is sufficiently clear, the Court must next decide whether the prohibition is so broad as to be unconstitutional. *Turner*, 482 U.S. at 89–90, 107 S.Ct. 2254, established the applicable test. First, prison regulations that impinge on constitutional rights must be reasonably related to a legitimate Governmental objective. *Id.* The constitutional right affected by Section 2(a) of the SAMs is Defendant's First Amendment right to free speech.

The Court finds that, while severe, the prohibition on forwarding any message—however innocuous or personal—is reasonably related to the legitimate Government objective of preventing Defendant from soliciting violence. Defendant allegedly coordinated acts of violence with co-conspirators outside of Defendant's prison in 2013. Def. Mot. Ex. A at 3. Barring Defendant from sending messages is reasonably related to the Government's interest in preventing Defendant from attempting to coordinate a similarly violent attack. The other *Turner* factors are (1) the existence of alternative means of the prisoner

exercising the right at issue, (2) the impact of the sought accommodation on prison guards, other inmates, and resources, and (3) the existence of obvious alternatives to the challenged regulation. 482 U.S. at 89–90, 107 S.Ct. 2254. These factors also weigh in favor of upholding Section 2(a). Defendant has alternative means of communicating with loved ones: he can send letters and make telephone calls. Furthermore, while removing the prohibition may not burden prison resources, it could burden law enforcement, and there is no obvious alternative to this restriction. *Id.*

Defense Counsel argue they are "alert to the risk" of passing on political or criminal plot-related messages, and "doubt that [Defendant] is in a position to manipulate them." Def. Mot. Ex. D at 3. While Defense Counsel are undeniably sophisticated and capable, they do not claim to be code-breakers or psychics. Even a sophisticated party may become an unwitting conduit for messages vital to a criminal conspiracy. Furthermore, Defense Counsel do not allege that the prohibition on forwarding personal "messages" prevents them from mounting an effective defense. Accordingly, the Court denies Defendant's motion to strike this provision of the SAMs.

### C. "Dissemination of Information"

Section 2(d) of the SAMs states:

The inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of preparing the inmate's defense—and not for any other reason—on the understanding that any such dissemination shall be made solely by the inmate's attorney, and not by the attorney's staff.

Defense Counsel argue this provision is both vague and overbroad because it is "unclear whether other defense team members can make use of information originating from [D]efendant." Def. Mot.

at 24–25; Def. Mot. Ex. D at 3. In their October 8, 2014 letter to the Government, Defense Counsel argued that this restriction is "impractical, if not impossible" to follow so long as "counsel strive to provide their client with effective assistance." Def. Mot. Ex. D at 3. Investigation of the charges against Defendant requires incorporating information from Defendant into inquiries about the charges. For example, an investigator may need to refer to a fact communicated by Defendant while questioning a witness. Defense Counsel cannot act as their own investigators because the offense and arrest took place in Niger and Mali, and Defense Counsel plausibly argue that any investigation will require knowledge of "French, Arabic, Tamasheq, Songhai, Hausa and Zarma—languages beyond the ken of [D]efense [C]ounsel." *Id.* at 3–4. Furthermore, any investigator assisting the defense team must undergo a background check and obtain clearance from the FBI and the USAG. *Id.* at 4; Def. Mot. Ex. A at 6.

The Government claims the SAMs would not thwart precleared investigators because "the SAMs provision is plain that the issue concerns the *dissemination* of the information, but does not restrict the defense team from using such information to further the defense." Opp. Mot. at 17 (emphasis in original). The Government concedes that "the SAMs place no limitations on how those individuals to whom counsel disseminates the information may use it." *Id.* at 18. Because the SAMs do not restrict investigators' use of any information from Defendant, the Court declines to modify Section 2(d) of the SAMs.

### D. "Inflammatory Materials"

Section 2(h)(i) of the SAMs prohibits Defense Counsel from providing Defendant with "inflammatory materials, materials inciting violence, military training materials, or materials that may be used to pass messages from inmate to inmate, un-

less such materials have been precleared by the USA/EDNY and FBI." Def. Mot. Ex. A at 9. Defense Counsel object to this provision as vague. Def. Mot. at 25; Def. Mot. Ex. D at 7. Defense Counsel argue that because Defendant has been accused of terrorism-related crimes and much of the Government's allegations include references to terrorist groups, a bar on "inflammatory materials" could be read to foreclose Defense Counsel from reviewing Government-produced discovery with Defendant. Def. Mot. Ex. D. at 7. The Government states that Section 2(h)(i) "should not be interpreted to prevent [D]efense [C]ounsel from sharing materials related to building a defense, such as discovery materials or the results of defense investigations." Def. Mot. Ex. F. at 2.

In the instant case, the Court agrees that the restrictions on "materials inciting violence, military training materials, or materials that may be used to pass messages from inmate to inmate" are reasonable. Furthermore, the Government does not object to Defense Counsel sharing discovery or the results of defense investigations with Defendant. The Government concedes the SAMs already permit such sharing. *Id.* Because the restrictions are reasonable and the Government has addressed Defense Counsel's concerns, the Court hereby denies Defense Counsel's motion to modify Section 2(h)(i).

### E. Arbitrary Distinctions Among Defense Team Members

### 1. Distinctions with Respect to Visits

Section 2(e) of the SAMs reads as follows:

> The inmate's attorney's precleared paralegal(s) may meet with the inmate without the need for the inmate's attorney's presence. These meetings may be contact or noncontact, at the discretion of the USMS/BOP/DF.

Def. Mot. Ex. A at 7. Section 2(f) of the SAMs reads as follows:

> The inmate may have multiple legal visitors provided that at least one of the multiple legal visitors is the inmate's attorney or precleared paralegal. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF. An investigator or interpreter/translator may not meet alone with the inmate.

Defense Counsel have objected to these provisions as creating arbitrary distinctions, arguing there is no rational basis for distinguishing between precleared paralegals and precleared investigators. Def. Mot. at 24; Def. Mot. Ex. D at 5. Defense Counsel further argue the distinction bars precleared mental health professionals from meeting alone with Defendant. Def. Mot. Ex. D. at 5. The Government's explanation for distinguishing between precleared paralegals and precleared investigators is that it "wishes to limit the people who may meet alone with [Defendant] to core members of the defense team, including attorneys and paralegals." Def. Mot. Ex. F at 3. The Government further offers the possibility of case-by-case exemptions for investigators. *Id.;* Opp. Mot. at 10. The Court finds this offer by the Government is sufficient at this juncture to address Defense Counsel's concerns. Therefore, the Court hereby denies the request to modify Section 2(e) of the SAMs.

## 2. Distinctions with Respect to Legal Telephone Calls

Section 2(g)(i) of the SAMs reads as follows:

> The inmate's attorney's precleared staff are permitted to communicate directly with the inmate by telephone, provided that the inmate's attorney is physically present and participating in the legal call as well.

Def. Mot. Ex. A at 8. Defense Counsel object to this provision as "harden[ing] the irrational distinctions among defense team members" by distinguishing between precleared staff and precleared attorneys for the purposes of legal phone calls. Def. Mot. at 35. Defense Counsel also argue that Section 2(g)(i) amounts to a "virtually insurmountable obstacle[ ]" on legal telephone consultations. *Id.* Defense Counsel claim these requirements in combination "unduly burden [Defendant's] Sixth Amendment right to counsel." *Id.* Defense Counsel have provided no support for their argument that the SAMs pose an insurmountable obstacle. The request to modify Section 2(g)(i) is therefore denied.

### F. Conference Calls

Section 2(b)(ii) of the SAMs requires that, for legal telephone calls, "[a]ny use of an interpreter/translator by the attorney shall be in the physical and immediate presence of the attorney—*i.e.,* in the same room. The attorney shall not patch through telephone calls, or any other communications, to or from the inmate." Def. Mot. Ex. A at 7.

Defense Counsel argue that Section 2(b)(ii) as it stands is unreasonably burdensome because Defense Counsel do not have French or Arabic interpreters regularly in the office; thus, they argue, Defendant could "rarely" initiate legal phone calls. Def. Mot. Ex. D at 5. Defense Counsel requests the Court modify the provision in the following ways: (1) strike the words "physical and" and "*i.e.,* in the same room," and (2) add at the end of the provision "the attorney may talk with the inmate with an interpreter who participates by conference call after the interpreter has represented to the attorney that nobody else is listening in on the conversation or is in earshot of the interpreter." Notice of Def. Mot. at 2. Defense Counsel claim their "proposed modification provides the protection the Government seeks since any interpreter who the Government has precleared to work on the case is trustwor-

thy." Def. Mot. Ex. D at 5. The Government replies to Defense Counsel that, "[t]o the extent you find that, in practice, you are unable to arrange for the [D]efendant to call you at times when a cleared interpreter can be present with you, please let us know and we will consider supporting an amendment to Section 2.b.ii along the lines you suggest." Def. Mot. Ex. F at 4.

Defense Counsel do not list any examples of actual difficulties they have had or will have in arranging for the Defendant to call them when they can have an interpreter present. Furthermore, the Court sees an obvious and legitimate Governmental interest in the Section 2(b)(ii) restriction. Section 2(b)(ii) prohibits multiple telephone connections. A conference call between Defendant, an attorney, and an interpreter in a different building would create telephone connections between people in three different buildings. While precleared attorneys and interpreters may be trustworthy, the risk of overhearing or eavesdropping (whether in-person or electronic) by an uncleared person is necessarily greater with multiple phone connections than with one. Therefore, the Court denies Defense Counsel's motion.

## IV. Defendant's Isolation and Physical Condition

Defense Counsel next argue the SAMs are punitive and therefore violate Defendant's Fifth Amendment right to due process because Defendant "now lives in nearly total isolation.". Def. Mot. at 37. Defendant may not communicate with other inmates. *Id.* He is theoretically permitted family visits, but his family is in Mali and it is "impossible" for them to visit. *Id.* He has "no relatives or friends outside Africa." Def. Reply at 10.

Section 3(a)(ii) of the SAMs provides for a minimum (*not* a maximum) of one phone call per month. Def. Mot. Ex. A at 10. Section 3(b) of the SAMs states that "[a]ll

telephone calls shall be in English unless a fluent USMS/BOP/DF- or FBI-approved interpreter/translator is available to contemporaneously monitor the telephone call" and that "[a]rranging for an interpreter/translator may require at least fourteen (14) days' advance notice."

Defense Counsel argue these theoretical monthly phone calls have not, in fact, taken place. Instead, the MCC has repeatedly failed to place calls that connect, despite Defense Counsel providing them with advice on how to do so successfully. Def. Reply at 13. Furthermore, all correspondence from Defendant's Malian family would be in French or Arabic, but any correspondence not in English can be held by the government for up to sixty (60) business days according to Section 3(g)(iv)(2) of the SAMs. Def. Mot. Ex. A at 14. These restrictions, Defense Counsel argue, are punitive because they are highly burdensome on family interactions. Def. Mot. at 37–38.

"In sum, the [G]overnment has confined [Defendant] to a single cell, barred communication with other inmates, and frustrated family contacts." Def. Mot. at 38. Because of this, Defense Counsel argue, Defendant has effectively been subjected to "inhumane conditions of solitary confinement." *Id.* at 10. Additionally, Defense Counsel argue that Defendant has "no opportunity for exercise" in his "small and cramped" cell, and that he has persistently suffered from the cold and lacked sufficiently warm clothing. *Id.* at 10–11.

As a solution short of vacating the SAMs in their entirety, Defense Counsel first move the Court to order the Government to provide Defendant with certain activities suggested by Ms. Vivianne Guevera, Director of Client Mitigation Services with the Federal Defenders. Notice of Def. Mot. at 2; Def. Mot. Ex. E. Ms. Guevera's suggested activities include television, pic-

ture books, self-guided classes, regularly scheduled visits with staff who speak Arabic or French, yoga, chess, and one-on-one basketball. Def. Mot. Ex. E at 4. Second, Defense Counsel request the Court to order the Government to work with Defense Counsel in finding "a mutually acceptable charitable organization that can send pre-cleared volunteers on a regular schedule to visit [Defendant] for the purposes of conversations and activities unrelated to the case or politics." Notice of Def. Mot. at 3. Third, Defense Counsel ask the Court to order the Government to ensure Defendant has sufficiently warm clothing and bedding. Fourth, Defense Counsel move the Court to order the Government to "provide [Defendant] a weekly meeting with MCC staff with an interpreter who speaks either French or [Defendant's] dialect of Arabic." *Id.* at 2. Fifth, Defense Counsel request the Court to order the Government to provide Defendant with scheduled weekly phone calls with his legal counsel. *Id.* Finally, Defense Counsel ask the Court to order the Bureau of Prisons and MCC to "conduct an on-site tour for the Court and parties of the cell(s) and areas of [Defendant's] confinement, or, in the alternative, provide photos." *Id.* at 3.

The Government argues that all these objections are moot, as it has addressed them already by: (1) allowing Defense Counsel to take dictation of Defendant's letters to family members; (2) confirming that Defendant has received thermal underwear and four blankets (two of them wool); (3) arranging for daily visits from Unit Team members who can communicate with Defendant in limited English, (4) weekly visits from psychology staff who "make use of Arabic or French speaking staff members" to speak with Defendant, daily visits from medical staff, and regular visits from a primary care physician who speaks fluent French; and (5) ensuring Defendant's receipt of books and a CD player for which Defense Counsel may

purchase CDs in the same manner they purchase books. Opp. Mot. at 23–24.

The Court agrees with the Government and finds these objections to be moot. Defendant has now received books and a CD player despite the initial delay in providing these materials to him. Defense Counsel should notify the Court if Defendant continues to experience delays in receiving the CDs purchased for him. The Court further denies Defendant's motion to order the Government to work with Defense Counsel to find a charitable organization that can send precleared volunteers to visit Defendant, as this is unduly burdensome on the Government and on the agencies involved in the security clearance process. Defense Counsel have not shown that Defendant needs such charitable visits if he is also receiving weekly meetings with MCC staff, as the Court has ordered. Finally, the Court denies Defense Counsel's request to order MCC and the Bureau of Prisons to conduct an on-site tour or provide photographs, as Defense Counsel have not provided arguments for the necessity of such a tour or photographs.

## V. Remaining Defense Requests

The Court hereby denies Defense Counsel's motion to order the Government to provide Defense Counsel with accountings and copies of any recordings of Defendant's telephone conversations. Notice of Def. Mot. at 2–3. Defense Counsel has shown no need for such an order.

## CONCLUSION

Therefore, for the reasons stated above, the Court hereby denies Defendant's motion to vacate or modify the SAMs.

*SO ORDERED.*